```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/9/15
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
TATYANA RUZHINSKAYA, as Administratrix of the                     :
Estate of MARINA ROCHNIAK, Deceased,                              :        14 Civ. 2921 (PAE)
*individually and on behalf of others similarly situated*,        :
                                                                  :        OPINION & ORDER
                                            Plaintiff,            :
                                                                  :
                                                                  :
                    -v-                                           :
                                                                  :
HEALTHPORT TECHNOLOGIES, LLC,                                     :
                                                                  :
                                            Defendant.            :
                                                                  :
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        This decision resolves a motion for class certification.  Plaintiff Tatyana Ruzhinskaya

claims that defendant HealthPort Technologies, LLC ("HealthPort")—a company that retrieves,

copies, and distributes patient medical records on behalf of healthcare providers in response to

patient requests—systematically overcharged persons who sought copies of such records from

such providers, in violation of New York state law.  Ruzhinskaya brings claims under New York

Public Health Law (PHL) § 18, which limits the amount a healthcare provider can charge a

patient for requested medical records to the provider's "costs incurred," and sets a 75 cents per

page cap on such charges; under New York General Business Law (GBL) § 349, which prohibits

deceptive trade practices; and for unjust enrichment.  She brings these claims on behalf of a

putative statewide class of individuals who were charged 75 cents per page by HealthPort for

copies of medical records.

        For the reasons that follow, the Court denies Ruzhinskaya's motion to certify a statewide

class.  That is because there are significant variations among healthcare providers in New York

with regard to the costs of retrieving, copying, and distributing medical records that make the determination of the "costs incurred" in meeting a request for such records incapable of common resolution on a statewide basis. Were the class defined at a statewide level, common issues of fact and law would not predominate over individualized ones, as required by Federal Rule of Civil Procedure 23(b)(3).

However, the Court holds, a more narrowly defined class, one drawn to include all requests for records made to the healthcare provider at issue in this case, Beth Israel Medical Center, would comply with Rule 23. Upon a motion for certification of such a class, the Court stands ready to certify such a class, and to appoint Ruzhinskaya as class representative, and her counsel, Motley Rice LLC, as class counsel.

## I.     Background[1]

### A.     Ruzhinskaya's Experience With HealthPort

Ruzhinskaya is administratix of her mother's estate. In that capacity, she brought a personal injury lawsuit in New York state court for injuries her late mother, Marina Rochniak,

---

[1] In reciting these facts and evaluating the evidence before the Court, the Court is mindful that "the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). The facts recited here are, unless otherwise noted, undisputed. The Court draws upon the following materials in this decision, to which no further citation will be made except when directly referenced or quoted: the Second Amended Complaint, Dkt. 39 ("SAC"); defendant's answer, Dkt. 41 ("Ans."); plaintiff's brief in support of class certification, Dkt. 82 ("Pl. Br."), along with the declarations of Mathew P. Jasinski, Dkt. 83 ("Jasinski Decl."), and Richard A. Royston, Dkt. 84 ("Royston Decl."), and attached exhibits; defendant's brief in opposition to class certification, Dkt. 132 ("Def. Br."), along with the declarations of Seth A. Litman, Dkt. 133 ("Litman Decl."); James DeFeo, Dkt. 134 ("DeFeo Decl."); and Gregory Trerotola, Dkt. 135 ("Trerotola Decl."), and attached exhibits; plaintiff's reply brief, Dkt. 144 ("Pl. Reply Br."), and the declaration of Mathew P. Jasinski and attached exhibits, Dkt. 145 ("Jasinski Reply Decl."); and the transcript of argument before the Court, Dkt. 149 ("Tr.").

had suffered.  In that lawsuit, Ruzhinskaya was represented by the law firm of Simonson Hess Leibowitz & Goodman, P.C. ("Simonson").  *See* Jasinski Decl., Ex. 28.

In the course of the representation, Simonson, on behalf of Ruzhinskaya, requested, and received from HealthPort, photocopies of her mother's medical records from Beth Israel Medical Center ("Beth Israel").[2]  *See id.*, Ex. 29.  Simonson's request forms the basis of Ruzhinskaya's claim to have been overcharged for such copies.

Specifically, on June 4, 2013, Simonson requested copies of the medical records, stating that "we will be glad to forward our check in the amount of $.75 per page."  *Id.*  On July 6, 2013, HealthPort, the company that Beth Israel had retained to handle the retrieval, copying, and delivery of patient medical records, sent Simonson a bill for $140.75.  *Id.*, Ex. 30.  This resulted from copying 185 pages of medical records at 75 cents per page, plus a $2.00 electronic delivery fee.  *Id.*  On July 8, 2013, Simonson paid the $140.75 bill.  Ans. ¶ 69.

Ruzhinskaya's personal injury lawsuit settled.  Under the settlement approved by the court, she paid Simonson, out of the gross settlement, $8,917.16 for disbursements the firm had advanced.  Jasinski Decl., Ex. 31, at 3.  This included $140 (not $140.75) attributable to HealthPort's bill.  *Id.*, Ex. 32, at 3.  In an affidavit submitted in state court in support of the settlement, Ruzhinskaya stated that its terms, including the fees and disbursements to be paid to Simonson, were "fair and reasonable under the circumstances."  Litman Decl., Ex. 11, at 10.

Simonson initially represented Ruzhinskaya in bringing this putative class action, which, as initially pled, was against HealthPort and several hospitals that had retained HealthPort to handle patients' requests for copies of medical records.  *See* Dkt. 2.  Approximately one month after filing Ruzhinskaya's initial Complaint, Simonson destroyed her file, apparently pursuant to

---

[2] Beth Israel's official name today is Mount Sinai Beth Israel.  *See* http://www.bethisraelny.org.

the firm's routine business practice.  *See* Dkt. 89, Ex. 3.  Ruzhinskaya later changed counsel; she is now represented by Motley Rice LLC.

> **B.     Procedural History**

On March 12, 2014, Ruzhinskaya, along with three other plaintiffs (Charles and Ann Marie Spiro, and Ismael Torres), filed the original Complaint in this case in New York State Supreme Court.  Dkt. 2.  On April 25, 2014, HealthPort removed the case to this Court, with federal jurisdiction based on the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  *Id.* On May 2, 2014, HealthPort moved to dismiss.  Dkt. 5.

On May 27, 2014, plaintiffs filed the First Amended Complaint ("FAC").  Dkt. 19.  A putative class action, the FAC named as defendants HealthPort and three hospitals that had retained HealthPort to handle patient records requests:  Beth Israel (which housed Ruzhinskaya's medical records), Mount Sinai Hospital (which housed the Spiros'), and Montefiore Medical Group Co-Op City (which housed Torres').  *Id.*  Each plaintiff claimed that, as a matter of uniform practice, HealthPort, as an agent of these healthcare providers, had charged requesters 75 cents per photocopied page, and that this rate was an unlawful overcharge.  The FAC brought claims under PHL § 18 ("Count One"); under GBL § 349 ("Count Two"); for unjust enrichment ("Count Three"); and, in addition to these damages claims, a claim for injunctive relief ("Count Four").

On August 29, 2014, the Court issued an Opinion & Order, Dkt. 38, dismissing the FAC, while granting Ruzhinskaya leave to amend.  *See Spiro v. HealthPort Technologies, LLC*, 73 F. Supp. 3d 259, 278 (S.D.N.Y. 2014) ("MTD Decision").  As to the Spiros and Torres, the dismissal was with prejudice because their claims were unavoidably time-barred.  *Id.*  But the dismissal was not with prejudice as to Ruzhinskaya, because her claims were timely, and the

4

defect found by the Court was correctable.  Specifically, Ruzhinskaya had failed to plead that

she, as opposed to her counsel, Simonson, had been contractually responsible for paying the

costs incurred in fulfilling her request for medical records.  *Id.* at 269.

Crucially, the Court rejected the alternative argument that HealthPort raised for dismissal,

based on its construction of PHL § 18(2)(e).  Section 18(2)(e) states:

> The provider may impose a reasonable charge for all inspections and copies, not
> exceeding the costs incurred by such provider . . . .  However, the reasonable charge
> for paper copies shall not exceed 75 cents per page.  A qualified person shall not be
> denied access to patient information solely because of inability to pay.

HealthPort had argued that § 18 categorically entitles a healthcare provider to charge a requester

75 cents per page for fulfilling records requests, regardless of the actual cost to the provider.

However, the statute's text authorizes a healthcare provider to impose only a "*reasonable charge*

*for all inspections and copies, not exceeding the costs incurred by such provider.*"  *Id.*  The Court

held that the portion of § 18 that states that "the reasonable charge for paper copies shall not

exceed 75 cents per page," while setting a cap on the per-page fee that a provider may charge,

does not mean that such a charge will always be reasonable.  *Id.* at 273.

The Court accordingly granted Ruzhinskaya leave to file a Second Amended Complaint

("SAC"), but limited such a complaint to Ruzhinskaya's damages claims against Beth Israel, the

healthcare provider that housed Rochniak's medical records, and HealthPort, to whom Beth

Israel was alleged to have delegated its responsibilities for fulfilling patient requests.

On September 10, 2014, Ruzhinskaya filed the SAC, the operative complaint here.  Dkt.

39.  The SAC, again a putative class action, realleged Counts One, Two, and Three from the

FAC against HealthPort and Beth Israel.  Curing the defect in the initial complaint, Ruzhinskaya

this time pled (and attached a retainer agreement reflecting) that she had been contractually

responsible, upon settlement of the estate's personal injury case, to pay Simonson's disbursements.  *See* SAC ¶ 76; *id.*, Ex. A.

On January 26, 2015, the parties stipulated to the dismissal of all claims against Beth Israel.  Dkt. 56.  This left HealthPort, Beth Israel's agent with respect to Ruzhinskaya's records request, as the sole defendant.

### C.    The Motion for Class Certification

On April 29, 2015, Ruzhinskaya moved for class certification.  Dkt. 74.  Consistent with having dropped Beth Israel as a defendant, she sought to represent a statewide class defined to include all requests by any patient or her representative for patient records from a healthcare provider in New York State for which HealthPort charged 75 cents per page:

> All persons, who, at any time from March 12, 2008 to the present (the "Class Period"), paid for, or are obligated to pay for, copies of an individual's patient information requested from a healthcare provider in the State of New York by the individual, the individual's estate, or the individual's legal guardian, attorney, agent, or anyone else acting on the individual's behalf, for which copies HealthPort Technologies, LLC charged $0.75 per page (the "Class").

Pl. Br. 23.

On May 6, 2015, Ruzhinskaya filed her brief in support of class certification, Dkt. 82, along with the declarations of Mathew P. Jasinski, Dkt. 83, and Richard A. Royston, Dkt. 84, and attached exhibits.  On July 7, 2015, HealthPort filed its brief in opposition, Dkt. 132, along with the declarations of Seth A. Litman, Dkt. 133; James DeFeo, Dkt. 134; and Gregory Trerotola, Dkt. 135, and attached exhibits.  On July 27, 2015, Ruzhinskaya filed a reply brief, Dkt. 144, and a declaration of Mathew P. Jasinski and attached exhibits, Dkt. 145.  On August 6, 2015, the Court held argument.  Dkt. 149.

## II.      Discussion

### A.  Construction of PHL § 18

The parties dispute whether certification of a statewide class of requesters of medical

records who were serviced by HealthPort, as Ruzhinskaya seeks, would satisfy Federal Rule of

Civil Procedure 23.  Underlying these disputes—particularly their central dispute over whether

common questions predominate over individual ones, *see* Fed. R. Civ. P. 23(b)(3)—are the

parties' antipodal constructions of PHL § 18.

Since its enactment in its present form in 1991, § 18 has been the subject of limited

litigation.  No reported case appears to have addressed an issue critical here: the means by which

a factfinder is to determine the "costs incurred" by a healthcare provider (or its agent), so as to

determine whether the provider's per-page charges exceeded those costs.  Because the parties'

opposing views as to this issue inform their arguments as to class certification, the Court

addresses at the threshold the proper construction of § 18.[3]

Section 18 requires a healthcare provider[4] to furnish to patients and other "qualified

persons," including their attorneys, *see* § 18(1)(g), a copy of the patient's medical records upon

written request.  § 18(2)(d).  It authorizes the provider to "impose a reasonable charge for all . . .

copies, not exceeding the costs incurred by such provider," which charge "shall not exceed 75

---

[3] Although Ruzhinskaya also brings two other claims—for deceptive business practices under
GBL § 349 and for unjust enrichment—the parties treat the liability inquiry under those statutes
as substantially the same as under PHL § 18.  For purposes of resolving this motion, the Court
assumes *arguendo* that liability under those two claims would turn on whether HealthPort's per-
page costs incurred were below 75 cents.

[4] The term "healthcare provider" is further defined to include a "health care facility" or a "health
care practitioner," which means, generally speaking, hospitals and doctors. *See* § 18(1)(b)–(d).
HealthPort does not dispute that § 18 applies to it as the entity to whom Beth Israel, a healthcare
provider, delegated responsibility under § 18 for responding to requests for medical records.

cents per page."  § 18(2)(e).  The Court has interpreted this language as establishing that a "reasonable charge" is the lower of (a) 75 cents, or (b) the provider's "costs incurred"; in other words, 75 cents is a ceiling, but will not invariably be a reasonable charge.  *Spiro*, 73 F. Supp. 3d at 273.

The parties disagree on two issues of statutory interpretation.

### 1.     What Costs Are Cognizable Among "Costs Incurred"?

The first issue involves the expenses that may be considered in determining a healthcare provider's "costs incurred" under § 18.

Ruzhinskaya argues that a finder of fact may consider only the costs *directly* attributable to the act of photocopying.  *See* Pl. Br. 6; Tr. 4–5.  She argues that cognizable costs are limited to the costs of the paper, ink, and toner used in connection with fulfilling a request for copies of medical records, as well as the presumably tiny proportion of the salary of the employee immediately responsible for making the copies allocable to filling the request at issue.  Tr. 5. She argues that the finder of fact may not consider the provider's indirect costs, such as its other labor costs (*e.g.*, the salaries of persons who do work other than copying in the course of fulfilling records requests, or of supervisory or managerial personnel, *see id.* at 5–6) or its overhead (*e.g.*, electricity, insurance, and administrative expenses, *see id.* at 6; Pl. Br. 6).[5]  This construction, by narrowly defining the provider's cognizable costs, would, of course, improve Ruzhinskaya's prospects of establishing liability for overcharging under § 18.

---

[5] At argument, Ruzhinskaya's counsel eventually conceded that, if the supervisor were "exclusively dedicated" to requests for medical records, then his or her labor could be counted. Tr. 14.

HealthPort, in contrast, argues that the term "reasonable charge" under § 18 does not limit "costs incurred" to the provider's direct costs generated by the act of photocopying. A finder of fact, HealthPort argues, may also consider the indirect costs to the provider occasioned by requests for patient medical records. As HealthPort explains, the process of complying with a request for records under § 18 entails more than simply inserting a sheaf of papers into a copying machine. *See* Litman Decl., Ex. 3 (listing some 32 steps). A provider must locate and retrieve the patient's medical records. This can be a time-intensive task as these records are often stored in different forms (*e.g.*, hardcopy or electronic files) and, depending on the nature of the records sought, may be stored in multiple physical locations or electronic databases. Def. Br. 5. The provider must also confirm the validity of the request and that the records located are both responsive and appropriate to release. *See* Litman Decl., Ex. 3. The provider, finally, must print or copy the responsive records and arrange for delivery of the copies to the requester. *See id.*

HealthPort argues that the statute permits it to take into account the costs attributable to all the various steps in the process, including labor costs and overhead expenses, to the extent fairly allocable to a particular records request; in other words, HealthPort argues that "costs incurred" means everything but profit. Tr. 32. To be sure, as HealthPort admits, at the point a lawsuit is brought that challenges a charge as excessive under § 18, the mechanics by which the records responsive to a particular request were retrieved, copied, and disseminated will almost always be lost to history. *Id.* at 43. There are no regulatory obligations to track the time spent on such tasks. *See id.* at 13. And—unlike professionals such as private-practice lawyers who may track their work for billable clients in tenths of an hour—healthcare providers have no reason to memorialize the time spent on such quotidian tasks. *See id.* at 41. Accordingly, which employees retrieved the patient's medical records, what means were used to do so, and how long

the retrieval, copying, and distribution processes actually took in any particular case will

generally be incapable of reconstruction.

Therefore, as HealthPort implicitly acknowledges, attributing costs to a particular records

request, for purposes of a *post hoc* lawsuit, is likely to entail aggregating the provider's overall

costs attributable to fulfilling patient requests for medical records (*e.g.*, the salaries of employees

to the extent they were tasked with participating in this process) and then allocating these costs to

particular requests on a *pro rata* basis, presumably based on the number of pages copied to meet

the request.  This is, in fact, how HealthPort appears ready to defend, on the merits, against this

lawsuit.  *See* Trerotola Decl. (estimating average per-page costs for five New York hospitals, and

using those measures to estimate a statewide average).  For present purposes, HealthPort's

argument is that whether aggregate costs are allocated *pro rata* to a particular request, or whether

evidence somehow survives that permits a reconstruction of the actual work and employee time

devoted to meeting a particular request, a provider defending against a lawsuit under § 18 may

take into account a far broader range of costs than Ruzhinskaya urges.  By expanding the costs

countable towards "costs incurred," this position, of course, tends to assist HealthPort as to

liability.

On this issue, the Court agrees with HealthPort.  The Court's determination—based on §

18's text, purpose, and legislative history to the extent discernible, and based on New York case

law interpreting the statute and its precursors—is that § 18(2)(e)'s unqualified reference to "costs

incurred" permits a provider to be reimbursed (up to 75 cents per page) for *all* demonstrable and

reasonable costs incurred in providing its services to a requester.  These include indirect as well

as direct costs.  And they may include the labor, supply, and overhead costs associated with

every step of the process of fulfilling a request for copies of medical records, spanning receipt of

the request, through retrieval and copying of the responsive records, to delivery to the requester. In an action brought under § 18, a finder of fact therefore is not limited to considering only the direct costs implicated by the physical act of photocopying, as Ruzhinskaya urges.

The statutory text simply does not provide any basis for artificially limiting the scope of "costs incurred" to a particular moment in time, to a specific list of costs, or to costs termed "direct" as opposed to "indirect." While Ruzhinskaya would limit compensable costs to "the incremental labor and supply costs for *copying* medical records," and would exclude the costs of "retrieving or handling the information" and "indirect overhead," Pl. Br. 6, § 18 affords no textual hook for such a construction. The statute does not, for example, modify the phrase "costs incurred" with words of limitation such as "incremental" or "direct."[6]

Further, used in ordinary parlance, the word "costs" would not be understood to carry such a cramped connotation. Asked about its costs, a service provider—for example, a shoe-shine business or a taxi-cab company—would not naturally limit the answer to direct costs (*e.g.*, the shoe polish or the gasoline). Such a provider would assuredly include indirect costs (rent, equipment, insurance, electricity, staff). Similarly here, the costs incurred by a healthcare provider (or its delegated agent such as HealthPort) would include indirect costs, *e.g.*, overhead and supervisory labor costs, as well as the work of retrieving a patient's medical records from within a hospital, database, or outside storage facility.

The statute's purpose and history support this inclusive reading. The legislature's purpose, as the Court has recognized, was to prevent making profits from the act of responding

---

[6] In contrast, New Jersey authorizes a "fee based on actual costs" but specifies that requesters shall not be charged for services other than copying (with specified per-page costs), searching, and shipping. *See Goldberg v. HealthPort Technologies, LLC*, No. 14 Civ. 2810 (WHW) (CLW), 2014 WL 3749210, at *3 n.4 (D.N.J. July 30, 2014).

to patient requests for their records.  *See Spiro*, 73 F. Supp. 3d at 273.  A consumer-protective

statute, § 18 is "designed to ensure that, as a general rule, patients have access to their own

medical records."  *Davidson v. State*, 771 N.Y.S.2d 197, 199 (3rd Dep't 2004).  The 75 cents

per-page cap was added in 1991; before that, the "reasonable charge" language did not impose a

fixed ceiling.  *See Casillo v. St. John's Episcopal Hosp.*, 580 N.Y.S.2d 992, 994–96 (Sup. Ct.

Suffolk Cty. 1992) (describing statute's history).   New York courts appear to have chafed at the

burden of determining what was and was not a "reasonable charge" in cases where the sums at

stake were quite small.  *See Ventura v. Long Island Jewish Hillside Med. Ctr.*, 492 N.Y.S.2d 96,

98 (2nd Dep't 1985) ("We note that appeals of this nature are not to be encouraged in view of the

small sum at issue.").  The 75 cents cap "was enacted to create a unifying definition for the

'reasonable charge' standard and to stem the burgeoning costs being imposed on patients seeking

to obtain their own medical records for whatever purpose."  *Casillo*, 580 N.Y.S.2d at 998.

Notably absent from the statute's history is any indication that the legislature sought to force

providers to take a loss on these services, rather than merely to prevent profiteering.

The limited case law is in accord.  An intermediate appellate court interpreting the pre-

1991 language found the costs charged by a hospital "reasonable inasmuch as its costs include

employee time in addition to duplication expense."  *Hernandez v. Lutheran Med. Ctr.*, 478

N.Y.S.2d 697, 698 (2nd Dep't 1984).  Another New York court approved including

"administrative charges," although it did not specify the precise nature of these charges.  *Kaplan

v. N. Shore Univ. Hosp.*, 459 N.Y.S.2d 361, 362 (Sup. Ct. Nassau Cty. 1982).  Other state courts

interpreting similar "reasonableness"-based statutes have endorsed an inclusive approach to

costs.  *See Colo. Consumer Health Initiative v. Colo. Bd. of Health*, 240 P.3d 525, 531 (Colo.

App. 2010) ("The terms 'costs' [sic] is not singular, and the statutes do not limit the 'costs' to the

costs of supplies and the labor of copying."); *Glover v. Ralph Meyers Trucking, Inc.*, 224 Mich.

App. 665, 673 (Ct. App. 1997) (including "itemized labor and machine maintenance costs").

      Thus, the statutory text, legislative purpose and history, and case law all support an

inclusive reading of the term "costs incurred."

      In the face of this reading, Ruzhinskaya relies on the federal Health Insurance Portability

and Accountability Act ("HIPAA"), the implementing regulations of which limit reimbursable

costs to a "reasonable, cost-based fee" defined to include labor, supplies, and postage, but not

overhead. *See* 45 C.F.R. § 164.524(c)(4). But HIPAA is irrelevant. Both the HIPAA statute and

the implementing regulations on which Ruzhinskaya relies post-date New York's enactment of

PHL § 18. Ruzhinskaya does not give any reason to treat the regulatory definition of

reimbursable costs in this wholly separate context as bearing on the intent underlying § 18.

      Therefore, the Court holds, § 18(2)(e) allows providers to charge—up to 75 cents per

page—for all demonstrable and reasonable costs fairly attributable to responding to patient

requests for medical records. In a case claiming an overcharge under § 18, a factfinder tasked

with determining whether the provider's per-page charge exceeded its "costs incurred" may

therefore consider these costs, including indirect costs and overhead.

### 2.      Does § 18 Prescribe Or Preclude Class Treatment?

      The parties separately disagree on the availability under § 18 of classwide relief against a

healthcare provider or a company like HealthPort that services many providers, with each party

again taking a position that reflects the outcome it desires as to the pending class certification

motion.

      HealthPort argues that § 18 contemplates only individual actions. Tr. 42 ("You can't

have class certification because this statute in and of itself . . . does not lend itself to class

certification.").  HealthPort acknowledges that, realistically, a provider will rarely be in a position, after the fact, to reconstruct all of the individualized facts that (assuming perfect information) might uniquely bear on the cost attributable to an individual records request.  *Id.* at 43.  For example, the personnel involved in retrieving a patient's records within a hospital or other repository, and the precise time increments that the retrieval, copying, and distribution of records took, will often be lost to history (as appears to be the case with Ruzhinskaya's records request).  Therefore, in practice, a provider will generally be forced to defend against a § 18 action by aggregating its costs incurred in responding to requests and allocating them, *pro rata*, to individual requests.  *See id.* at 49.  Despite this, HealthPort appears to argue that individual requesters may not band together in a class action to challenge the provider's pricing.

> Ruzhinskaya counters that § 18 permits statewide class actions.  Indeed, she argues, § 18 is unusually amenable to class actions where, as here, the provider charges requesters a uniform per-page rate.  That is because the other key factual variable as to liability—the provider's "costs incurred" per-page—must be calculated by attributing aggregate cost data *pro rata* to individual requests, and is thus apt to be resolved by use of generalized proof.  *See* Pl. Br. 29–31.

The short answer is that § 18 simply does not speak to individual versus class actions.  Its text and its history are silent as to the manner in which a requester's right not to be overcharged may be vindicated in court.  And § 18's requirement that a provider be limited to a "reasonable charge" does not presuppose resolution of claims against it on an individual or class basis.  The statute plainly allows the "costs incurred" by a particular request for patient records to be determined based either on proof specific to that request (in the unlikely event that it exists) or on aggregated costs allocated *pro rata* to each request.  This is the necessary consequence of the

14

fact that the statute allows consideration of costs that are not particularized to specific records requests (like overhead and supervisory labor costs), as discussed above. These means of proof—individual or *pro rata*—may be more or less conducive to classwide resolution.

The propriety of class certification is instead, in this Court, the exclusive province of Federal Rule of Civil Procedure 23. As discussed below, HealthPort is correct that, in a case in which a provider were capable of defending its pricing based on cost considerations unique to a particular request, substantial questions would arise as to the viability of a class resolution under Rule 23. Similarly, Ruzhinskaya is correct that, in a case in which the "costs incurred" as to a particular request were derived by a *pro rata* allocation of aggregated costs, certification of a class would be more appropriate. The Court now turns to the application of Rule 23 to the dispute at hand.

### B.       Class Certification

Ruzhinskaya seeks certification of a class defined as:

> All persons, who, at any time from March 12, 2008 to the present (the "Class Period"), paid for, or are obligated to pay for, copies of an individual's patient information requested from a healthcare provider in the State of New York by the individual, the individual's estate, or the individual's legal guardian, attorney, agent, or anyone else acting on the individual's behalf, for which copies HealthPort Technologies, LLC charged $0.75 per page (the "Class").

Pl. Br. 23.

### 1.       Compliance with Fed. R. Civ. P. 23(a)

Under Rule 23(a), a proposed class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation, as well as the implied requirement of ascertainability.

a.  *Numerosity*

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." *See generally Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995) (numerosity requirement presumed met if a class consists of at least 40 members); *see also* 28 U.S.C. § 1332(d)(5)(b) (requiring total class membership of at least 100 for cases, like this, brought pursuant to CAFA).

That requirement is easily met here.  Between March 2011 and December 2014, HealthPort issued 524,619 unique invoices for New York-based requests for patient information, charging all but one of its 17,514 New York customers (the overwhelming majority of whom were personal injury lawyers) a fee of 75 cents per page.  *See* Jasinski Decl., Ex. 9.  Although some of these requests were likely not by or on behalf of the patients whose records were sought and were therefore not subject to § 18's price cap (*e.g.*, requests by insurance companies or opposing counsel), the volume of requests makes it evident that the numerosity requirement is met.

b.  *Commonality*

The commonality requirement requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," that their claims are based on a "common contention" that is "capable of classwide resolution," and that resolving that contention will "resolve an issue that is central to the validity" of each claim.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks omitted).

Here, there are clearly issues of law and fact common to a statewide class.  The underlying questions of law are common to the class.  In particular, the Court's construction of

16

the critical statutory term "costs incurred" applies across the class.  There are also common

questions of fact.  Most obvious is whether HealthPort routinely billed 75 cents per page to fill

requests for patient records, as it appears to have done.  *See* Jasinski Decl., Ex. 9.  Another

question common to the class is whether HealthPort, in responding to patient records requests,

served as the provider's agent.  The existence of such common questions suffices to meet the

commonality requirement.  *See, e.g.*, *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 415 (S.D.N.Y.

2013), *aff'd* 602 F. App'x 3 (2d Cir. 2015) (defendant's uniform conduct as to all class members

weighs in favor of commonality).

To be sure, the parties dispute whether the other key fact on which liability will turn—

whether HealthPort's "costs incurred" were at least 75 cents per page—is a common question

across the statewide putative class.  For the reasons that the Court reviews in addressing Rule

23(b)(3)'s predominance requirement, if the class is defined broadly at a statewide level, this

issue is not necessarily common to its members.  That is because HealthPort's costs incurred

differ across the 500-some New York providers it services, and therefore if HealthPort may

defend its costs with respect to at least some providers by justifying them at the provider level,

these costs cannot be commonly determined statewide.  *See infra* section (II)(B)(2)(a)(ii).  But

where numerous common issues exist, the existence of an issue that is not common to the entire

class, while potentially precluding a finding a predominance under Rule 23(b)(3), does not

preclude a finding of commonality under Rule 23(a)(2).  *See Sykes v. Mel S. Harris & Assoc.*

*LLC*, 780 F.3d 70, 86 (2d Cir. 2015) ("All that must be proven, at this stage, is that 'there are *in*

*fact* sufficiently . . . common questions of law or fact.'" (quoting *Dukes*, 131 S. Ct. at 2551)).

The Court therefore finds the commonality requirement satisfied.

c.      *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class."  This requirement is satisfied where each class member's

claim "arises from the same course of events" and each class member must "make[] similar legal

arguments to prove the defendants' liability."  *Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir.

1993).  Where the same allegedly unlawful conduct "was directed at or affected both the named

plaintiff and the class" she represents, "minor variations" will generally not prevent the typicality

requirement from being satisfied.  *Id.* at 936–37.  The typicality and commonality requirements

"tend to merge."  *Dukes*, 131 S. Ct. at 2551 n.5 (quoting *Gen. Tel. Co. of Southwest v. Falcon,*

457 U.S. 147, 157–158 n.13 (1982)).

The typicality requirement is met here, because Ruzhinskaya's claims and those of the

class she seeks to represent arise from the same conduct by HealthPort (charging a uniform, and

allegedly cost-unjustified, per-page charge of 75 cents) and because Ruzhinskaya and similarly

situated requesters must prove similar facts, and make similar legal arguments, to prevail.

In opposing a finding of typicality, HealthPort argues that Ruzhinskaya is subject to

unique defenses.  Certification is indeed "inappropriate where a putative class representative is

subject to unique defenses which threaten to become the focus of the litigation."  *Gary Plastic

Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d. Cir.

1990).  Here, HealthPort claims atypicality based on the facts that (1) Ruzhinskaya "did not fully

reimburse Simonson for the cost of her medical records," (2) her counsel, Simonson, "voluntarily

offered to pay HealthPort $.75 per page for the medical records," and (3) in settling the estate's

lawsuit, Ruzhinskaya represented that all of Simonson's costs were "fair and reasonable," which,

HealthPort argues, waived her ability to claim a violation of § 18.  Def. Br. 26–27.

These facts do not make Ruzhinskaya atypical.  As to the first, Ruzhinskaya reimbursed Simonson for $140 on a $140.75 bill.  As she points out, she therefore bore "any overcharge for 184 out of 185 pages of medical records."  Pl. Reply Br. 9.  That Ruzhinskaya did not bear the cost of the additional page is irrelevant to typicality; at most, it would be relevant to her damages.  Ruzhinskaya's claim is still fundamentally typical of the class and the disparity "does not go to the heart of [her] case."  *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 180 (S.D.N.Y. 2008).

As to the second alleged atypicality, the fact that Simonson, in requesting medical records, agreed to pay HealthPort's per-page charge did not waive Ruzhinskaya's right to challenge that charge under § 18.  Ruzhinskaya had no way to know at the time whether the charge exceeded HealthPort's "costs incurred."  Ruzhinskaya also likely had no other practical means of obtaining her mother's medical records.  Nor does Simonson's agreement to pay the charge make Ruzhinskaya atypical:  It is likely that most, if not all, members of the putative class agreed to and did pay HealthPort's per-page charge, without stating that they were doing so under protest.

As to the third, the fact that Ruzhinskaya approved of Simonson's cost outlays, including for medical records, as "fair and reasonable" in settling the personal injury suit she brought on behalf of Rochniak's estate addressed a different issue entirely from the legality under § 18 of HealthPort's charges: whether Simonson had been reasonable in incurring and paying these expenses, including the charges it was billed by HealthPort for Rochniak's records.  Ruzhinskaya's representation says nothing about whether or not HealthPort's charge exceeded its "costs incurred."  It cannot fairly be portrayed as reflecting an inconsistent earlier position of Ruzhinskaya's as to whether HealthPort was in compliance with § 18.

On each point, HealthPort thus has, at most, identified "minor variations" that do not undermine the typicality of Ruzhinskaya's claims. *Robidoux*, 987 F.2d at 936. Therefore, the Court holds, Ruzhinskaya satisfies the typicality requirement.

> ### d.   Adequacy

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Rule 23(a)'s adequacy requirement tests whether: (1) the plaintiff's interests are antagonistic to the interests of other class members; and (2) plaintiff's counsel are qualified, experienced, and capable of conducting the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

As to the first issue, the question is whether the class action would involve fundamental conflicts of interest between the plaintiff and the class. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). HealthPort argues that Ruzhinskaya's class definition creates a conflict between class members because, under a *pro rata* approach, a class member whose requests in fact cost less to process will effectively be subsidizing class members whose requests cost more. *See* Def. Br. 28–30. Ruzhinskaya responds that where, as here, it is impossible to reconstruct the employee time spent or other precise costs incurred on a particular request, and where "costs incurred" can be determined instead only by a *pro rata* methodology, there is no conflict among class members whose costs are allocated *pro rata* from the same aggregated costs, and that this methodology will "provide each class member with precisely what she is owed." Pl. Reply Br. 10. The Court agrees with Ruzhinkskaya that using a *pro rata* methodology does not undermine her adequacy as a class representative. HealthPort's stated fear that some class members would subsidize others turns on an apparent fiction, which is that, after the fact, the time its employees spent fulfilling a particular records request can be reconstructed.

Where such proof is lacking, such that even in an individual action the plaintiff would have no choice but to measure costs by using a *pro rata* methodology, a class action does not necessarily disadvantage any potential class member.

HealthPort also argues that Ruzhinskaya is inadequate because her then-attorney in this lawsuit, Simonson, "willfully destroyed relevant records from the Malpractice Action one month *after* filing this litigation"; it claims that the "defense of spoliation threatens to become the focus of the litigation." Def. Br. 30–31. But such a lapse by Simonson does not affect Ruzhinskaya's ability to effectively prosecute this action. Given that the parties' dispute here turns on the tabulation of HealthPort's costs, Simonson's credibility is not at issue in this case. There is, for example, no dispute that Simonson requested Rochniak's mother's medical file, or that HealthPort provided 185 pages in response to that request, charging 75 cents per page.

Simonson's testimony, if relevant for any purpose, has no bearing on the resolution of "costs incurred." Any attacks defense counsel might try to make on Simonson's credibility on this ground—if permitted at all—would not be "so sharp as to jeopardize the interests of absent class members." *Vincent v. Money Store*, 304 F.R.D. 446, 460 (S.D.N.Y. 2015) (quoting *Lapin*, 254 F.R.D. at 177). Simply put, Simonson's destruction of its case file, lamentable though it was, does not undermine Ruzhinskaya's ability to pursue relief for the class. *Compare Falcon v. Philips Elecs. N. Am. Corp.*, No. 06 Civ. 6090 (JSR), 2007 WL 959374, at *2 (S.D.N.Y. Mar. 30, 2007), *aff'd* 304 F. App'x 896 (2d Cir. 2008) (discarding of allegedly defective television undermined plaintiff's ability to serve as class representative).[7]

---

[7] The Court has not resolved HealthPort's motion for sanctions based on spoliation, *see* Dkt. 85, but it is prepared to state that if any sanction is imposed, it would take the form of a monetary sanction, rather than an adverse inference instruction. No adverse inference is merited here.

Finally, Ruzhinskaya's present counsel in this putative class action is adequate and is untainted by Simonson's lapse.  Motley Rice LLC has substantial experience in class action and consumer litigation.  *See* Jasinski Decl., Ex. 33.  HealthPort does not appear to challenge Motley Rice's qualifications.

Therefore, the Court finds that Ruzhinskaya will fairly and adequately protect the interests of the class.

### e.   Ascertainability

The Second Circuit has recognized an "implied requirement of ascertainability."  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006).  The Second Circuit recently clarified that "the touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  *Brecher v. Republic of Argentina*, 802 F.3d 303, 304 (2d Cir. 2015) (internal quotation marks omitted).  "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case."  *Id.* at 305 (quoting *Charron v. Pinnacle Grp. N.Y. LLC,* 269 F.R.D. 221, 229 (S.D.N.Y. 2010) (internal quotation marks omitted).  Class members need not necessarily be identified at the time of class certification, but "they must be ascertainable at some stage of the proceeding."  *Bakalar v. Vavra*, 237 F.R.D. 59, 64 (S.D.N.Y. 2006); *see also Brecher*, 802 F.3d at 305.

HealthPort argues that individualized inquiries will be required to determine class membership.  That is because, for some records requests, it may not be immediately clear whether the patient, or a law firm bringing or exploring a case on her behalf, ultimately bore HealthPort's charge.  Where the attorney was solely accountable for paying that charge, the

patient would not belong in the class.  *See Spiro*, 73 F. Supp. 3d at 268.  Therefore, HealthPort

argues, determining class membership would require individualized inquiries into attorney

retention agreements, and perhaps into the terms under which lawsuits were settled and costs

reimbursed.  *See* Def. Br. 18–19.  HealthPort argues that the proposed class definition creates

two possible plaintiffs—attorney and client—for every records request made by an attorney, and

thereby would necessitate an "investigation" into which of the two is the rightful class member.

*Id.* at 21.

The Court holds otherwise.  As Ruzhinskaya points out, the attorneys who made requests

for records, to the extent members of the class, did so as agents for clients—the class as defined

would not include, for example, a patient's opposing counsel.  *See infra* section (II)(B)(4).  It is

administratively feasible for HealthPort to identify, in each instance, the party it billed and the

party from whom it received payment.  As for the distribution of the proceeds of any judgment

here as between attorneys and clients, it is reasonable to expect an attorney to abide by a

fiduciary and/or contractual duty to return to the client money the client paid but which has been

recouped.  *Cf. In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935,

967 (N.D. Ill. 2011).  A well-designed claims process can further assure that any attorney

claimant has notified the client of a recovery in this case and/or has certified the appropriate

person to receive it.

To the extent HealthPort claims that the class definition creates two plaintiffs for any

request by an attorney, that too is wrong.  In the event of an adverse judgment, HealthPort faces

no risk of a double recovery.  It would be obliged to pay only once as to each request.  The

concern HealthPort expresses of a follow-on demand by the client after the attorney has obtained

a recovery can be addressed by the inclusion in the claims process of an appropriate release.

*Brecher*, on which HealthPort relies, is inapposite.  There, the Second Circuit noted, the proposed class definition permitted potential class membership to be transferred over time, for instance through the sale of beneficial interests that cannot be traced or uniquely identified.  *See* 802 F.3d at 305–06.  That problem is not present here.  Nor does this case implicate the risk that a person will seek to recover as part of the class based on an unsubstantiated memory of paying for HealthPort's services.  *See Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742 (DLC), 2010 WL 3119452, at *13 (S.D.N.Y. Aug. 5, 2010).  The scope of claims recoverable here is limited by documentary proof of payments made to HealthPort in connection with filling a records request.

The Court therefore finds that the members of the proposed class are readily ascertainable by objective criteria.

### 2.  Compliance with Fed. R. Civ. P. 23(b)(3)

Ruzhinskaya argues that class certification is proper under Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  This rule is designed to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997) (internal quotation marks omitted).

### a.  Predominance

Although the predominance requirement is "far more demanding" than the commonality requirement, *id.* at 624, it does not require that there be *no* individual questions, but only that the

24

issues resolvable through generalized proof "are more substantial than the issues subject only to individualized proof." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (quoting *UFCW Local 1776 v. Eli Lilly & Co.,* 620 F.3d 121, 131 (2d Cir. 2010)).

The parties take polar opposite positions as to predominance.  Ruzhinskaya argues that common questions predominate across a statewide class because (1) the per-page charge that HealthPort imposes is uniform across the state, and (2) the costs incurred by HealthPort are capable of being calculated on a statewide basis and then averaged across all records requests within the state.  Thus, Ruzhinskaya argues, liability—here, meaning whether HealthPort overcharged customers—can be determined through generalized proof across all New York State requesters.

HealthPort counters that that "each putative class member's claim is as unique as his or her request for records, and the cost of fulfilling that request must be calculated individually," and therefore individualized questions necessarily predominate over common ones.  Def. Br. 24.

Neither party's analysis is persuasive.

### i.     HealthPort's position

HealthPort's argument that § 18 claims can be litigated only individually is at war with the evidence.  HealthPort's practice of charging 75 cents per page copied pursuant to a request by patients or their representatives was uniform across the class.  And as to the cost side of the equation, HealthPort's own submissions refute its declaration that "the cost of fulfilling [a] request [for records] must be calculated individually."  Conceivably, HealthPort could have chosen to create and maintain records permitting a request-specific calculation.  For example, it could have recorded the time spent by its personnel retrieving, copying, and delivering records in response to each request.  Had Healthport put itself in position to perform such a request-specific

25

tabulation, then it could plausibly argue that the cost for fulfilling a request "must be calculated individually."

However, HealthPort— understandably—chose not to create and maintain any such records. It did not put itself in a position to defend its billings as to particular requests with reference to request-specific data. HealthPort therefore has indicated that, to defend an action such as Ruzhinskaya's, it would seek to establish a per-page cost of 75 cents or more by allocating collective costs *pro rata* among requests. This methodology is permissible under § 18, because, as noted, the term "costs incurred" permits either individualized or collectivized tabulation of costs (and certain cost inputs on which HealthPort relies—such as overhead—can only be attributed to a request via a *pro rata* methodology).

HealthPort's rhetoric about the need for an individualized calculation of cost is thus in stark conflict with the approach it proposes to use in practice to defend on the merits against claims such as Ruzhinskaya's. HealthPort embraces the allocation *pro rata* of cost inputs such as overhead. But it implies that this approach cannot be used where the cost input is one as to which HealthPort could have kept records on an individualized basis, but chose not to do so. There is no principled basis for this distinction. Indeed, tellingly, HealthPort's own expert, Gregory Trerotola, utilizes a methodology for calculating per-page costs that relies heavily on allocating aggregated costs *pro rata*. Using five providers (all hospitals) as examples, Trerotola tabulates a distinct per-page cost for HealthPort for the process of filling requests at each of the five. These hospital-level costs range from 38 cents to $1.08 per page, based on the hospitals' differing cost inputs. *See* Trerotola Decl., Ex. A, at 7.

HealthPort's insistence that costs that theoretically could have been tracked on an individualized basis cannot be calculated using a *pro rata* methodology is also cynical, because it

would effectively prevent any claim from ever being vindicated under § 18.  It would enable a provider or its agent to prevent any requester from challenging a charge as excessive under § 18, by arguing that tracking individualized costs was excused as impractical, *see* Tr. 41 (statement by HealthPort counsel that "[y]ou would need a stopwatch" to measure the time each employee spent on each request), while arguing that use of a *pro rata* methodology was legally precluded.[8]

The Court recognizes that, as a matter of business pragmatism, HealthPort's decision not to track costs on a request-specific basis is eminently sensible.  It would likely be infeasible, and would generate a host of secondary costs and bureaucratic red tape, for a provider to clock the time spent locating, copying, and disseminating requested medical records.  And the statute does not impose any such obligation.  But it does not follow from that that HealthPort is excused from defending its blanket 75 cents per page charge by other means (*e.g.*, allocating costs to individual requests on a *pro rata* basis).  Instructively, the District of Columbia Court of Appeals, considering a consumer class action claiming unconscionably high charges for copies of patient medical records, permitted the case to be litigated based on *pro rata* allocation of the healthcare provider's costs.  *See Ford v. Chartone, Inc.*, 908 A.2d 72, 91 (D.C. 2006) ("[I]n evaluating the

---

[8] At argument opposing class certification, HealthPort belatedly appeared to claim that request-specific costs *can* be reconstructed.  *See* Tr. 49.  HealthPort did not concretely support that claim, which conflicts with HealthPort's preceding statement at argument that, to calculate labor costs on a request-specific basis, "[y]ou would literally have to have somebody follow someone around with a stopwatch," a practice HealthPort acknowledges that it did not and realistically could not undertake.  *Id.* at 46.  The difficulty of reconstructing individualized costs is highlighted by HealthPort's own objection to one of Ruzhinskaya's discovery requests: "to the extent [that the request] seeks information relating to costs associated with individual Records Requests," HealthPort's objection stated, HealthPort "does not keep [such] records in the ordinary course of its business."  *See* Jasinski Decl., Ex. 20, ¶ 19.  The objection added: "HealthPort does not maintain labor cost data in the ordinary course of its business specific to processing patient information in New York in response to requests."  *Id.*  HealthPort does maintain, or at least appears able to reconstruct, for each of its providers in New York, aggregate data about pages produced and costs incurred.  *See* Litman Decl., Ex. 4.

reasonableness of the company's uniform clerical, copying, and shipping fees in relation to its costs, the relevant comparison is to the company's *average* costs."). This Court therefore emphatically rejects HealthPort's claim that a class action challenging its pricing practices is categorically inconsistent with the predominance requirement. On the contrary, where the sole disputed element, "costs incurred," is to be determined based solely on the *pro rata* allocation of aggregated costs, common issues—within the universe of patient requests to which these aggregated costs all apply—necessarily predominate.

The Court, finally, addresses a separate argument HealthPort makes in arguing against certification of any class here. HealthPort argues that an action in which "costs incurred" would be determined by a *pro rata* allocation of aggregate costs is in tension with case law disfavoring overbroad statistical modeling in class actions, in particular, *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).

These cases are briefly summarized. In *Comcast*, plaintiffs' damages model measured damages traceable to four distinct theories of antitrust injury, although the district court had allowed only one theory to proceed on a classwide basis. Because the damages model did not distinguish between the various theories, the Supreme Court held, common issues did not predominate, for individualized inquiries would be required into how different class members had been affected, and some class members would not have been entitled to damages at all. *Comcast*, 133 S. Ct. at 1434–35. Other cases on which HealthPort relies are ones in which statistical models enabled plaintiffs to recover despite the absence of demonstrated liability. *See Houser v. Pritzker*, 28 F. Supp. 3d 222, 253 (S.D.N.Y. 2014) ("Plaintiffs' proposed damages model is vastly overinclusive, and doubtlessly includes individuals who are not entitled to backpay . . . ."); *Griffith v. Fordham Fin. Mgmt., Inc.*, 12 Civ. 1117 (PAC), 2015 WL 1097327,

at *5 (S.D.N.Y. Mar. 12, 2015) (plaintiffs sought to prove case through representative testimony that defendants required class members to work at least 48 hours per week, but failed to show that all potential class members were required to and did work that much); *cf. McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2008) (disapproving of modeling techniques that "would inevitably alter defendants' substantive right to pay damages reflective of their *actual liability*") (emphasis added).[9]

HealthPort argues that, under these precedents, its right to pay only those damages reflective of its actual liability would be abridged were it found liable to a class member here based on a *pro rata* calculation of "costs incurred."  In fact, however, the cases on which it relies are far afield.  There, a party had proposed, in lieu of establishing liability on an individual basis even though doing so was attainable, to establish liability through use of an over-inclusive statistical formula.  But no such end-run is contemplated here.  HealthPort had the opportunity to retain evidence as to the costs incurred fulfilling individual patient requests.  It did not do so. There is no apparent means, for example, to reconstruct the increments of time spent retrieving Rochniak's records or those requested as to any other patient.  Therefore, HealthPort has proposed to defend against Ruzhinskaya's case, as it may, on the basis of its *pro rata* costs incurred.  Under these circumstances, the use of aggregate data, whether in an individual or a class action, would not evade the requirement of establishing actual liability—the concern

---

[9]Although not cited by HealthPort, another example of a case involving challenges to statistical methodology in class actions is *Tyson Foods, Inc. v. Bouaphakeo*, in which the Supreme Court has granted certiorari on the question "[w]hether differences among individual class members may be ignored and a class action certified . . . where liability and damages will be determined with statistical techniques that presume all class members are identical to the average observed in a sample."  Cert. Pet. at i, *Tyson Inc. v. Bouaphakeo* (No. 14-1146).

animating the cases on which HealthPort relies.  Such data instead would represent, quite simply, the best available means of reliably tabulating HealthPort's per-page costs.

ii.    *Ruzhinskaya's position*

Ruzhinskaya's argument for a statewide class falters for a different reason.  It defines the class too broadly—so broadly, in fact, as to include requests for patient medical records made to more than 500 different New York healthcare providers, where the costs of responding to requests for records appear to differ substantially among these providers.

As a preface, the statute itself contemplates actions against a *provider* for its overcharges. While the parties here agree that HealthPort may be sued as the agent to whom a provider, Beth Israel, outsourced its duties in responding to patients' records requests, the statute by its terms is addressed to what a "provider" may charge for fulfilling these requests—defining "provider" as, in essence, a hospital or a doctor.  *See* § 18(1)(b)–(d).  A New York hospital that itself handled responses to records requests would be limited to charging 75 cents per page, and, in practice, would presumably attempt to justify the charge it imposed by calculating the costs it incurred in fulfilling the requests of all qualified requesters, and allocating the aggregate costs attributable to this service *pro rata* among these requests.

But while a provider in practice will need to aggregate costs and allocate them *pro rata* among requests, it does not follow that retrieving, copying, and distributing records generates the same costs for each provider across New York State.  And HealthPort derives its statutory duty from each provider's statutory obligation.  HealthPort effectively stands in the shoes of around 500 New York providers who have delegated to it the responsibility for responding to patient records requests.  *See* Litman Decl ¶ 20 (as defined, class "includes persons who obtained medical records from 507 different institutions").

30

Conceivably, where (1) numerous providers had delegated under common terms to a common agent such as HealthPort their obligations under § 18 with respect to records requests, and (2) it was established that, at trial, the agent would defend its uniform statewide per-page price solely by reference to its statewide average costs in fulfilling these requests, a class action could proceed against HealthPort consistent with Rule 23(b)(3).  Section 18, while envisioning direct actions against a provider, would not appear to bar such a proceeding.

But, on the present record, this is not such a case.  Instead, as reviewed more fully below, it appears that HealthPort would attempt to defend a statewide class action, at least in part, on the basis of provider-specific costs, which vary dramatically.  This inquiry into how liability would be litigated is critical because, to assess whether a class is properly certified, the Court is required to consider, concretely, the evidentiary means by which liability would be established, and refuted, at trial.  "A district judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met."  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 42.  And while a court considering a motion for class certification is not to resolve the merits, it is appropriate to examine the means by which the merits would be resolved at trial to make its Rule 23 determination, and whether they lend themselves to certifying the class as proposed.  *See Sykes*, 780 F.3d at 86.  That, in turn, requires attention not merely to how the plaintiff would attempt to establish liability, but also how the defendant would attempt to refute it.  *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001) ("[A] court must examine the relevant facts and both the claims and defenses in determining whether a putative class meets the requirements of Rule 23(b)(3).");  *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007)

31

("[I]ndividual questions concerning damages and defenses might defeat certification of the entire case . . . .").

Here, HealthPort's submissions strongly suggest that it would defend against a statewide class action both by pointing to its statewide costs—which it contends exceed 75 cents per page—and, where such an argument was available, by arguing that its costs in connection with the particular provider exceeded that figure.[10]  Various evidence shows that the costs HealthPort incurred in fulfilling patient records requests, far from being uniform across the state, differed significantly across healthcare providers in New York State.

In particular, HealthPort has submitted a cost study from its expert—whose conclusions on this point are not challenged by Ruzhinskaya's expert—which demonstrates significant cost variation between hospitals.  *See* Trerotola Decl., Ex. A, at 7.  Specifically, HealthPort's expert, Trerotola, selected five New York hospitals as "fairly representative" of the providers which used HealthPort employees exclusively to manage the process of responding to patients' records requests.  *Id.* at 5–6.  For each hospital, Trerotola totaled the aggregate hours that HealthPort employees spent on processing copy requests.  He then multiplied these hours by an hourly wage determined with Bureau of Labor Statistics data.  He then divided that sum by the total number of pages produced to requesters on behalf of the hospital.  This yielded a distinct per-page labor cost for each hospital.  Trerotola also took into account supply costs and off-site retrieval costs, both of which also differed by hospital.  Tretotola also allocated across hospitals various

---

[10] To be sure, because HealthPort has wrongly insisted that there is "no statutory basis" for permitting "costs incurred" to be proven by an "average costs" methodology, Def. Br. 6 n.1, it has not squarely stated how it would defend such a class action.  But its expert report makes clear that its evidence, if credited, would support, at least as to some providers, both a provider-level and a state-level defense.  It is reasonable to infer that were a statewide class certified, HealthPort would seek to defend using both statewide and provider-level measures of "costs incurred."

HealthPort expenses that do not appear to differ by hospital, including centralized processing

costs (excluding postage and delivery costs), and indirect overhead, including information

technology costs and "sales, general, and other administrative expenses." *Id.* at 6–8.

The study concluded that the per-page costs varied significantly by hospital:  They were

38 cents at one hospital, 69 cents at a second, 84 cents at a third, 92 cents at a fourth, and $1.08

at a fifth.  *Id.* at 7.  Thus, the hospital with the highest costs had nearly three times the per-page

costs of the hospital with the lowest.  These variations largely reflected the differing manners in

which hospitals maintain patient records (*e.g.*, in paper versus electronic form) and the

consequently different burdens presented by retrieving and copying such records.  *Id.* at 5.

Ruzhinskaya retained an expert consultant, Richard A. Royston, who agreed that

Trerotola's general approach to tabulating HealthPort's costs was "acceptable."  Royston Decl. at

3.  However, Royston took issue with a separate conclusion of Trerotola's study: that the cost per

page across New York State was about 78 cents, and that within New York City, it was

approximately 86 cents (due to higher labor costs).  Disputing the basis for a finding of a

statewide average cost of 78 cents, Royston argued that, while Trerotola had used the raw

average of the five site-wide averages, a proper methodology would use a weighted average

based on the total pages produced at each site.  This, he calculated, would result in a 56 cents

statewide average (and 62 cents for New York City).  *Id.* at 4–5.  This is because the site with the

lowest costs accounted for 66% of the pages produced across the five sites.  *Id.* at 5.  Royston

also calculated yet lower per-page costs if certain costs were excluded and if a different

methodology were used to calculate direct labor costs.  *Id.* at 6–10.

The issue before the Court with respect to Rule 23(b)(3), however, is not the merits issue

of whether HealthPort is or is not liable to Ruzhinskaya (or any other member of the putative

class)—*i.e.*, whether HealthPort's per-copy "costs incurred" were 75 cents or more.  It is whether and to what extent that merits determination can be made on the basis of common proof.  As to that point, Ruzhinskaya's expert, Royston, does not take issue with Trerotola's explanation of why certain costs (labor, supply, and off-site retrieval) differ across providers, so as to yield differing tabulations of costs incurred depending on the provider.

At a trial involving a statewide class, HealthPort would therefore have every reason to defend its 75 cents per-page charge both on a statewide basis *and* on a provider-level basis with respect to providers where there was an evidentiary basis for claiming provider-level costs were 75 cents or more per page.  Three of the hospitals used as examples in Trerotola's study had per-page costs exceeding 75 cents.  A trier of fact that was persuaded by HealthPort's provider-level cost analysis—but, for whatever reason, not by its statewide level analysis—would, therefore, be obliged to make different liability findings on a provider-by-provider basis.  Ruzhinskaya's statewide class would thus sweep in plaintiffs whose requests for medical records generated a range of different costs, depending on the costs particular to the provider's circumstances.  It would treat all such plaintiffs alike, despite the possibility that some of them might be entitled to relief based on the provider-level costs incurred and others might not be.

Ruzhinskaya's one-size-fits-all approach is, further, blind to variations among the class beyond those exposed by Trerotola's cost comparison among the five hospitals, which might bear on the finder of fact's assessment of provider-level "costs incurred."  HealthPort had a "full service" contract with each hospital considered by Trerotola, under which HealthPort's employees were situated on site at the hospital.  Trerotola Decl., Ex. A, at 5.  But HealthPort's contractual arrangements with other providers differed, including, for example, "partner" arrangements under which the hospital's employees utilized HealthPort's software and

centralized processing.  *Id.*  The costs incurred in this arrangement would logically be calculated in a fundamentally different manner.  These might include costs attributable to the provider's own employees and expenses and might require inquiry into HealthPort's economic arrangement with the provider.  For these reasons, as HealthPort's counsel aptly summarized at argument, the steps used in processing a patient's records request "can vary from hospital to hospital depending on the business model of that particular hospital, what they have asked HealthPort to do, and how hard it is to do it."  Tr. 51.

An alternative way to capture the flaw in Ruzhinskaya's proposal is this:  Were a statewide class certified, HealthPort could have unique defenses as to requests involving providers whose average costs exceeded 75 cents.  Where HealthPort could produce reliable evidence of provider-level costs in excess of 75 cents, it would be entitled to defend its costs with respect to that provider on that basis, and, if such evidence were credited, to prevail as to its pricing of requests made to that provider.

Thus, because the class includes claims that HealthPort may choose to defend on the basis of provider-level costs, a statewide class would fail to satisfy the predominance requirement.  Provider-level inquiries would unavoidably predominate, and overwhelm common inquiries, in establishing both liability and damages at trial.  And using Ruzhinskaya's non-representative experience in seeking medical records from Beth Israel as a proxy for determining HealthPort's liability to the members of a statewide class who sought records from other providers would yield unreliable outcomes, to the potential detriment of both class members and HealthPort.  On the one hand, certification of a statewide class could disfavor HealthPort to the extent liability were found with respect to requests made to Beth Israel but might not have been found at a hospital where per-page costs were higher than 75 cents.  This result would unjustly

enrich requesters as to whom a provider-level inquiry would have resulted in a finding of no liability. Alternatively, certification of a statewide class might disfavor absent class members to the extent liability were *not* found with respect to requests made to Beth Israel but might have been found at a hospital where per-page costs were lower than 75 cents. This result would unjustly inoculate HealthPort against all statewide claims, even if it justly might have faced liability with respect to healthcare providers as to which its per-page costs were lower than 75 cents. *Cf. Pearce v. UBS PaineWebber, Inc.*, 2004 WL 5282962, at *10–11 (D.S.C. Aug. 13, 2004) (predominance requirement not met where defendants could prove that some class members were not actually injured using more particularized information).

The Court has considered the possibility of certifying provider-level subclasses. But that approach is untenable. It would result in a host of separate inquiries into costs incurred, potentially one for each of the 500-some providers implicated by Ruzhinskaya's proposed class. This approach is unmanageable. *See* Fed. R. Civ. P. 23(b)(3) (requiring "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy").

Ruzhinskaya's motion for certification of a statewide class therefore unavoidably fails the predominance requirement, and must be denied. However, a class drawn at the level of requests to Beth Israel, Ruzhinskaya's provider, would satisfy the predominance requirement, because HealthPort has failed to show that it can establish per-page costs for each separate request made to that institution or for any narrower group of requests than at the provider level.

> b.     *Superiority*

Rule 23(b)(3) also requires that the class action be "superior to other available methods for fair and efficient adjudication of the litigation." Specifically, the Court is to consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning

the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Here, a statewide class as proposed by Ruzhinskaya is not superior, because, as noted, resolving the issue of "costs incurred" across 507 healthcare providers would create significant problems of manageability.  A jury, as trier of fact, potentially could be called upon to resolve disputes regarding cost inputs at hundreds of providers.  With Ruzhinskaya alone having stepped forward to claim an interest in pursuing her rights under § 18, there is no persuasive justification for inviting such an extended and complex proceeding.

That said, assuming the class were limited to persons who requested records from a single provider, such as Beth Israel, thereby reducing the "costs incurred" inquiry to a single provider-level inquiry, a class action would be superior to the alternative of an individual lawsuit.  No potential class member has displayed any interest in bringing an individual lawsuit.  Nor, to the Court's knowledge, has any potential class member ever previously brought such a lawsuit.  Further, the costs of bringing this lawsuit would be prohibitive for any single class member or even a small group of them:  The out-of-pocket costs alone (apart from legal fees) for an individual to bring this suit would have almost certainly dwarfed even the highest realistically imaginable recovery for that individual.  *Cf. Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).  Common resolution of a provider-level class's claims against HealthPort is, therefore, superior to any other available method of resolution.

HealthPort argues that managing a class action would be too difficult, pointing out that plaintiff has not "offered a trial plan" and that there is "no previous trial track record" in a similar case.  Def. Br. 35 & n.17.  But reducing the parameters of the case to a provider level would vastly simplify the inquiry at hand.  The Court expects that the parties would put forward to the factfinder their competing claims as to what HealthPort's costs were in meeting records requests directed to Beth Israel.  That factfinding task is far less complex, and apt to be far less drawn out, than those necessitated by many areas of complex civil litigation (*e.g.*, antitrust and securities-law claims).  And "there is no general rule which requires a trial plan as an essential element of the superiority requirement," *Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159, 203 (W.D.N.Y. 2003), *aff'd*, 428 F.3d 408 (2d Cir. 2005), or for that matter, requires that trials raising similar issues have been litigated on an individual basis as a prerequisite to certification of a class.

The Court therefore finds that, provided that the class definition were limited to the provider level, the class action mechanism would be superior to other available methods of adjudication.

### 3.    Alternative Class Definition

It follows from the foregoing discussion that a class limited to records requests directed to Beth Israel *would* satisfy Rule 23(b)(3).  Were the class defined to encompass qualified persons who sought medical records from Beth Israel and whose requests were fulfilled by HealthPort, the critical element of "costs incurred" would be resolved uniformly across the class such that common questions would then predominate.  And such a class action would be superior

to individual actions.[11]  A class thus defined also has the further virtue of tracking the text of §

18, which defines the obligations of the "provider" when charging for copies of medical records.

The Court has authority *sua sponte* to modify a proposed class definition.  *See* Fed. R.

Civ. P. 23(c)(4); *Vincent*, 304 F.R.D. at 453 ("[A] district court may carve out a narrower class

from an overbroad class proposed in the Complaint.") (citing *Lundquist v. Sec. Pac. Auto. Fin.*

*Servs. Corp.*, 993 F.2d 11, 14 (2d Cir. 1993)); *see also In re Sumitomo Copper Litig.*, 262 F.3d

134, 139 (2d Cir. 2001); *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 180 (S.D.N.Y.

2005) (ordering *sua sponte* modification); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F.

Supp. 3d 415, 423 (S.D.N.Y. 2014) (noting the "substantial discretion" of trial courts to alter the

class).  In deference to the parties, however, the Court will not *sua sponte* order certification of

such a class.  *See Lundquist*, 993 F.2d at 14 ("The [district] court . . . is not obligated to

implement Rule 23(c)(4) on its own initiative.").  The Court will instead give Ruzhinskaya the

opportunity to determine whether to move for such certification (as opposed to pursuing this case

individually).  If Ruzhinskaya moves to certify a class defined by patient record requests made to

Beth Israel, the Court expects to certify such a class.

### 4.    Necessary Modifications to Class Definition

Having analyzed the Rule 23 factors and found that a provider-wide class, though not a

statewide class, would satisfy them, the Court addresses more technical aspects of Ruzhinskaya's

class definition.  Several other modifications would be needed to permit certification of a class

drawn at the provider level.

---

[11] A class so defined, at least on the record before the Court, would also satisfy the requirements
of numerosity, commonality, typicality, adequacy, and ascertainability, substantially for the
reasons discussed above.

First, the proposed class definition is overbroad temporally.  It includes putative class members who paid HealthPort 75 cents per page going back to March 12, 2008, six years prior to the filing of the complaint in this action.  But the Court has already held that each of the three damages claims brought here "is subject to a three-year statute of limitations."  *Spiro*, 73 F. Supp. 3d at 276.  Therefore, the class period must begin no earlier than March 12, 2011.

Ruzhinskaya counters that the Court erred in failing to apply a six-year statute of limitations to the unjust enrichment claim because it "seeks the equitable remedy of restitution, for which the limitations period is six years."  Pl. Br. 23 n.25 (citing *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509 (2d Cir. 2001)).  HealthPort responds that, where a cause of action would not exist but for a statute, as in this case, a three-year statute of limitations applies.  Def. Br. 17 n.9.  On this point, HealthPort is correct.  In *Matana v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013), upon which Ruzhinskaya relies, this Court *assumed* but did not hold that a six-year statute of limitations applied to an equitable claim for disgorgement, although such a claim essentially sought monetary recovery, usually subject to a three-year limitations period.  But, in *Access Point Med., LLC v. Mandell*, 963 N.Y.S.2d 44 (1st Dep't 2013), which this Court relied on in *Matana*, the New York court emphasized that "calculated use of the term 'disgorgement' instead of other equally applicable terms such as repayment, recoupment, refund, or reimbursement, should not be permitted to distort the nature of the claim so as to expand the applicable limitations period from three years to six."  *Id.* at 47.  Here, where Ruzhinskaya simply seeks repayment of fees paid in excess of the permissible statutory charge, the three-year limitations period applies.

Second, the proposed class definition appears to sweep in attorneys not representing a "qualified person" as defined by the statute.  Section 18 defines a "qualified person"—to whose

requests the per-page cap applies—as, *inter alia*, a patient or "an attorney representing a qualified person . . . who holds a power of attorney from the qualified person . . . explicitly authorizing the holder to execute a written request for patient information under this section."  § 18(1)(g).  Two intermediate New York appellate courts have divided on whether this language encompasses a situation where, for instance, a patient-plaintiff in a malpractice action authorizes the *defendant*'s attorney to seek copies of the patient's medical records.  *Compare McCrossan v. Buffalo Heart Grp.*, 695 N.Y.S.2d 852 (4th Dep't 1999), *with Davenport v. Cty. of Nassau*, 666 N.Y.S.2d 28 (2nd Dep't 1997); *see also Halio v. IOD Inc.*, 928 N.Y.S.2d 812, 814 (Sup. Ct. Nassau Cty. 2011) (identifying the conflict).  The Court holds that the plain language of the statute encompasses only requests by patients' attorneys, not any attorneys authorized by the patient to request copies.  Therefore, the class definition must be limited to requests by "qualified persons" within the meaning of § 18(1)(g) as so interpreted.

The Court notes, separately, that HealthPort, on two grounds, challenges the proposed class definition as sweeping in persons who lack standing.  First, HealthPort objects that the proposed class would include individuals who merely incurred an obligation to pay HealthPort but have not actually paid it.  This group may be substantial:  Only about 78% of HealthPort's New York invoices from 2011 through 2014 had been fully paid as of February 3, 2015.  *See* DeFeo Decl., Ex. 1.  This argument is not persuasive, however, because persons who have been billed by HealthPort but have not yet paid it may yet do so.[12]  *See Denney v. Deutsche Bank AG*,

---

[12] Contrary to HealthPort's argument, the Court's prior decision did not dispose of this issue. The Court merely held that a plaintiff who reimbursed her law firm for the cost of copying lacked standing unless she pled that she had had a contractual or other legal obligation to do so, rather than doing so as "an act of grace."  *Spiro*, 73 F. Supp. 3d at 268.  The Court did not have occasion to address whether actual reimbursement as of the date of Ruzhinskaya's suit was required for standing.

443 F.3d 253, 264 (2d Cir. 2006) (injury-in-fact exists when the harm is "actual *or imminent*," and mere "fear or anxiety of future harm" may suffice) (emphasis added). However, were Ruzhinskaya to prevail in a class action, as part of the claims process, proof of a class member's payment would of course be a prerequisite to his or her monetary recovery.

Second, HealthPort objects that the proposed class does not exclude those who were overcharged by HealthPort, but who were subsequently reimbursed by opposing counsel for these costs, for example, as part of the settlement of a lawsuit. For two reasons, the Court disagrees that that such class members could not reclaim, and that HealthPort could retain, the overcharge found. First, the absorption by an adversary of a plaintiff's costs as part of the resolution of a lawsuit cannot be viewed in isolation. The payment of such costs may have effectively been in exchange for remediation of comparable value. Second, the claims process is capable of assuring that a class member whose costs were later covered by a third party notifies that third party, so as to enable any claim among them to be resolved.

The Court therefore stands ready, upon a motion by Ruzhinskaya, to certify a class defined as follows:

> All persons, who, at any time from March 12, 2011 to the present (the "Class Period"), paid for, or are obligated to pay for, copies of an individual's patient information requested from Beth Israel Medical Center by a "qualified person" as defined in New York Public Health Law § 18(1)(g), for which copies HealthPort Technologies, LLC charged $0.75 per page (the "Class").

### C.    Class Counsel

Under Rule 23(g)(1), the Court must appoint class counsel. The Court is to consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

These requirements are satisfied by Ruzhinskaya's firm, Motley Rice LLC.  The firm appears to have done significant work in connection with this action, to be experienced in handling class actions and consumer litigation, to be knowledgeable about the applicable law, and to be committed to devoting the resources necessary to representing the class.  HealthPort has not challenged the firm's qualifications.  Therefore, upon an application for certification of the class as defined above, the Court stands ready to appoint Motley Rice LLC as counsel for such a class.

## CONCLUSION

For the reasons set forth above, the Court denies Ruzhinskaya's motion for certification of a statewide class.  However, the Court stands ready to certify a narrower class, defined at the level of Ruzhinskaya's healthcare provider, Beth Israel, upon such a motion.  Any such motion is to be made within two weeks of this decision.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: November 9, 2015
        New York, New York