UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TATYANA RUZHINSKAYA, as Administratrix
of the Estate of MARINA ROCHNIAK, Deceased,
on behalf of herself and all others similarly
situated,

                    Plaintiff,

-against-

HEALTHPORT TECHNOLOGIES, LLC,

                    Defendant.

Case No. 1:14-cv-02921(PAE)

ECF Case

Electronically Filed

**REDACTED PUBLIC VERSION**


**DEFENDANT HEALTHPORT TECHNOLOGIES, LLC'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
TO EXCLUDE THE TESTIMONY OF RICHARD ROYSTON**

THOMPSON HINE LLP

Seth A. Litman (admitted *pro hac vice*)
Rebecca Brazzano
335 Madison Avenue
New York, New York  10017
(212) 344-5680

-and-

LYNCH DASKAL EMERY LLP
James R. Lynch
Scott R. Emery
137 West 25th Street, Fifth Floor
New York, New York  10001
(212) 302-2400

*Attorneys for HealthPort Technologies, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ROYSTON'S OPINIONS AND BASES ............................................................................ 2

I.    Calculating "Costs Incurred" Requires Knowledge
of the ROI and Hospital Industries. .................................................................... 2

II.   Royston Has No Experience Evaluating Financial
Information From Hospitals And ROI Service Providers. .................................... 3

III.  Royston Performed No Material Research To Learn
About HealthPort or Beth Israel's Accounting Structures. ................................. 4

IV.  Royston's Methodology Improperly Extrapolates
Data and Frequently Shifts in His Three Reports. .............................................. 6

A.  Royston Flip-Flopped and Failed to Follow
GAAP on HealthPort's Bad Debt Expense. ...................................... 6

B.  Royston Created An Inflated Total Page Count,
Diluting The Cost Per Page. .............................................................. 7

C.  Royston Significantly Underaccounted For Employee Salaries,
But Changed them Based on Trerotola's Report. .............................. 9

D.  Royston Double Counted Expenses to Drive Down HealthPort's
Indirect Costs, and Changed His Calculation When He was Caught. ........... 11

E.  Royston Excluded Beth Israel's Indirect Costs Without Support,
Then Attempted to Add Them Back Without Using Beth Israel's
Actual Indirect Cost Data. ................................................................ 13

LAW & ARGUMENT ...................................................................................................... 15

I.    Royston Is Unqualified As An Expert In The Relevant Fields Of Knowledge. ............... 16

II.   Royston's Opinions Are Unreliable. ................................................................... 19

A.  Royston Did Not Apply Proper Accounting Principles
To Exclude HealthPort's Bad Debt. .................................................. 20

B.  Royston Miscalculated HealthPort's Indirect costs. ......................... 21

C.  Royston Improperly Excluded Beth Israel's Indirect Costs,
Despite This Court's Order That Indirect Costs Are Part Of
The "Costs Incurred" Calculation. ..................................................... 21

D.  Royston Relied On A Knowingly Wrong Calculation Of
The Total Number Of Pages Processed During The Class Period. ............... 23

E.  Royston Failed To Properly Account For Employee Salaries. .................... 24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adesina v. Aladan Corp.*,
438 F. Supp. 2d 329 (S.D.N.Y. 2006)......................................................................16

*Bank of N.Y. Mellon v. WMC Mortg., LLC*,
No. 12-cv-7096 (DLC), 2015 U.S. Dist. LEXIS 108320
(S.D.N.Y. Aug. 17, 2015)........................................................................................16

*Daubert v. Merrell Dew Pharms., Inc.*,
509 U.S. 579 (1993)...........................................................................................15, 19

*Dollman v. Mast Indus.*,
08 Civ. 10184 (WHP), 2011 U.S. Dist. LEXIS 99802
(S.D.N.Y. Sept. 6, 2011).....................................................................................15, 16

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
367 F. Supp. 2d 413 (W.D.N.Y. 2005).................................................................17

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
No. 11 Civ. 4209 (KBF), 2013 U.S. Dist. LEXIS 155136
(S.D.N.Y. Oct. 29, 2013)....................................................................................17, 19

*Louissier v. Universal Music Group, Inc.*,
No. 02 Civ. 2447 (KMW), 2005 U.S. Dist. LEXIS 45430
(S.D.N.Y. June 28, 2005).......................................................................................17

*Marini v. Adamo*,
995 F. Supp. 2d 155 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016).................19

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)....................................................................................16

*Oleg Cassini, Inc. v. Electrolux Home Prods.*,
No. 11-cv-1237 (LGS) (JCF), 2014 U.S. Dist. LEXIS 52085
(S.D.N.Y. Apr. 15, 2014).........................................................................................19

*SEC v. Mudd*,
No. 11-cv-9202 (PAC), 2016 U.S. Dist. LEXIS 59273
(S.D.N.Y. May 4, 2016).....................................................................................16, 21

*SEC v. Tourre*,
950 F. Supp. 2d 666 (S.D.N.Y. 2013)..................................................................15, 16

*Stagl v. Delta Air Lines*,
    117 F.3d 76 (2d Cir. 1997)..................................................................................................17

*Trumps v. Toastmaster, Inc.*,
    969 F. Supp. 247 (S.D.N.Y. 1997) ......................................................................................17

**Rules**

Federal Rule of Evidence 702.........................................................................................2, 15, 16, 19

## INTRODUCTION

Although the financial data did not changed after completion of discovery, Plaintiff's sole expert in this case, Richard Royston, submitted three different reports offering three different analyses of the costs incurred at Beth Israel for the provision of release of information ("ROI") services.  With each report, his methodology[1] fluctuated as did his opinions on the per page "cost incurred" for medical records to be produced records in response to patient requests at Beth Israel.  ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████: [2]

| Year | April 2016 Report | May 2016 Corrected Report | June 2016 Rebuttal Report |
|------|-------------------|---------------------------|---------------------------|
| 2011 | ████ | ████ | ████ |
| 2012 | ████ | ████ | ████ |
| 2013 | ████ | ████ | ████ |
| 2014 | ████ | ████ | ████ |
| 2015 | ████ | ████ | ████ |

In the end, the very fact that Royston could not provide a conclusive opinion on his first analysis, and produced three different opinions on the same data is enough to show his unreliability.  An expert who cannot clearly and accurately analyze data the first time, or even a

---

[1] Two of Royston's changes to his calculations occurred after his April 27, 2016 deposition.

[2] *See* Royston April 15, 2016 Report (the "April 15 Report") at 13; Royston May 2, 2016 Corrected Report (the "May 2 Report") at 14; Royston June 10 Supplemental/Rebuttal Report (the "Rebuttal Report") at 45 (attached to the Declaration of Seth Litman in Support of Motion to Exclude ("Litman Decl.") as Exs. A-C respectively). These figures include Royston's calculation with Beth Israel's indirect costs.

second or third time, cannot be reliable and must be excluded.  And these results were predictable.  This is because Royston lacks the requisite expertise in dealing with the highly specialized ROI and hospital industries to properly devise and apply a sound methodology for calculating HealthPort's costs incurred, and he failed to perform the research necessary to provide him a with a concrete basis upon which to render a reliable opinion.

Accordingly, pursuant to Federal Rule of Evidence 702, the Court should exclude Royston's opinions and testimony.[3]

## ROYSTON'S OPINIONS AND BASES

### I. Calculating "Costs Incurred" Requires Knowledge of the ROI and Hospital Industries.

Hospital and medical reproduction industries are "specialized industries which require specialized knowledge to understand their unique regulatory and financial reporting requirements."  (Report of Bryan I. Hirsch ("Hirsch Rpt.") at 3 (attached as Ex. D to the Litman Decl.).)  In this case, this includes having an understanding of how HealthPort (a large corporation) and Beth Israel (an 856 bed teaching hospital) operate and work together to respond to medical records requests.  An average juror may understand the notion that there are costs associated with doing business, but it is unlikely that he/she would understand how to analyze costs involving an ROI process where two large companies work together to perform a service, but are wholly different corporate entities with different purposes and separate cost structures.

In addition to the complexities of the relationship, each of HealthPort and Beth Israel are subject to regulatory structures that govern their activities.  (*See id.* at 2-4.)  For example, one opining on the costs of ROI services must be aware of the rigorous protocols imposed by

---

[3] If the Court grants HealthPort's Motion to Exclude, then HealthPort will seek summary judgment because Plaintiff will lack expert support, or any other evidence, for her claim that HealthPort's per page costs incurred to respond to medical records requests during the class period was less than .75 cents per page.

2

Medicare for allocating costs between hospital departments.  (*See* Report of Gregory Trerotola ("Trerotola Rpt.") at 13 (attached as Ex. E to the Litman Decl.).)  These regulations directly impact Beth Israel's accounting, and come into play in analyzing Beth Israel's costs associated with the provision of ROI services.

Because of these complexities, both Plaintiff and HealthPort engaged experts to analyze these costs – Royston and Trerotola respectively – to assist the trier of fact in understanding the costs incurred in responding to medical records requests to Beth Israel.  (*See* May 2 Rpt. at 2; Trerotola Rpt. at 2.)  But, while Trerotola has extensive experience analyzing costs of both hospitals and ROI companies, Royston is a professional expert who lacks any such knowledge or experience.  Moreover, rather than educating himself and learning about these fields in order to generate a reliable opinion, Royston instead chose to engage in speculation and supposition, typically without any basis or explanation, to support his client's litigation position.

## II.     Royston Has No Experience Evaluating Financial Information From Hospitals And ROI Service Providers.

Royston testified that he is not an expert in the very area in which Plaintiff seeks to proffer his testimony:  financial structures and accounting operations of ROI contractors like HealthPort and hospitals.  (2016 Deposition of Richard Royston ("Apr. 2016 Dep.") at 47:10-48:14 (attached as Ex. F to the Litman Decl.); Rebuttal Rpt. at 6 ("Prior to this engagement, my experience in the fields of hospitals and medical records had not been extensive, and ***I had no experience in the release of information industry***." (emphasis added)).)  It would follow, and Royston confirmed, that he lacks any expertise or knowledge in accounting procedures required of Medicare, Medicaid, and the Department of Health and Human Services, which are crucial components of a hospital's cost reporting structure.  (Apr. 2016 Dep. at 50:8-12.)

Not only is Royston admittedly not an expert in these areas, he admittedly has never

3

performed a financial analysis of a hospital, medical facility or ROI company, and he has *no personal knowledge as to how ROI departments in hospitals and clinics operate*. (*Id.* at 17:16-21; 2015 Deposition of Richard Royston ("2015 Dep.") at 86:10-13 (excerpts attached as Ex. G to the Litman Decl.).)

Royston has **never**: 1) been employed by a hospital or ROI company; 2) performed an audit or other accounting function for a hospital or ROI processing company; or 3) visited and observed the operations of any hospital's ROI department. (2015 Dep. at 44:5-45:1.)

**III. Royston Performed No Material Research To Learn About HealthPort or Beth Israel's Accounting Structures.**

The American Institute of Certified Public Accountants, Inc. ("AICPA") litigation support guidelines requires a CPA who wishes to provide an expert litigation opinion to either be knowledgeable about the industry in which they intend to opine or educate themselves on those industries. The AICPA *Code of Professional Conduct* requires that a testifying CPA: (1) ensure professional competence; (2) employ due professional care; (3) adequately plan and supervise the provision of professional services; and (4) obtain sufficient relevant data. (Hirsch Rpt. at 2 and Exs. D, E & F thereto.) Without such knowledge, the AICPA discourages its members from offering litigation opinions – because they would not be reliable.

Royston fails here. Royston acknowledged that he did not understand the "big picture" of hospital finance and the ROI process. He testified that he knew he needed additional information. (Apr. 2016 Dep. at 38:8-40:5.) To try to find this information, however, Royston's "research" consisted of Google and "library portal searches," with the majority of his "research" consisting of Google searches. (*Id.* at 35:11-37:15 (noting that his research regarding hospital financial data consisted of 90% Google searches and 10% researching through library portals).) Even after these Google and library portal searches, though, Royston admitted that he *did not*

4

*find any material information* that provided him with the big picture on hospital finance and the ROI operations to assist him with his opinions.  (Apr. 2016 Dep. at 37:16-39:23.)  He proceeded with his analysis anyway.  (*Id.* at 38:23-40:1.)

To be sure, Royston had adequate information available to him from which he could obtain background about hospital finance and the ROI industries from the very organization that issues his license:  the AICPA.  For example, Royston did not consult the *Audit and Accounting Guide Health Care Entities* (the "Guide")[4] published by his licensing organization, the AICPA, and is available to all CPA's.  (*See* Hirsch Rpt. at 3.)  Instead, he opted to do nothing.

Royston could also have sought accounting and operational information from current Beth Israel employees or other accountants with experience with hospital and ROI financial structures.  In rendering his opinions, he did not ask for nor perform independent interviews of release of information employees at Beth Israel (or at any hospital or clinic), he sought no counsel from accountants with industry experience, and he did not even ask Plaintiff's counsel to take a deposition to clarify Beth Israel's financial data.  (2015 Dep. at 85:19-22; Apr. 2016 Dep. at 30:22-31:6, 35:6-10, 46:25-47:9.)

One source that Royston had for his 2015 report but did not have for his first 2016 Beth Israel report was HealthPort's expert Greg Trerotola.[5]  In 2015, HealthPort voluntarily provided Trerotola's report before Royston produced a report, and Royston heavily relied on Trerotola's methodology and analyses.  In 2016, however, as Plaintiff's expert, Royston had to provide his calculation of Beth Israel cost per page <u>first</u> to support Plaintiff's case, and he had no Trerotola

---

[4] The Guide was designed specifically "to assist health care entities in preparing financial statements in conformity with generally accepted accounting principles … and to assist independent auditors in auditing and reporting on those financial statements."  (*See* The Guide at Chapter 1 (Ex. H to the Litman Decl.).)  The Guide would have provided Royston with the necessary understanding of the regulations that effect Beth Israel.  (*See Id.*; Hirsch Rpt. at 3.)

[5] In 2015, Royston accepted Trerotola's methodology wholesale and many of his numbers, performing no independent research on or testing of any of Trerotola's data.  (2015 Dep. at 84:14-85:13.)

5

analysis upon which to rely.  The significant changes that occurred from Royston's April 15

Report to his June 10 Rebuttal Report, are largely attributable to his receipt of Trerotola's May

13, 2016 Report and subsequent deposition in which the vast flaws in the April 15 Report were

exposed.[6]  This is a testament to Royston's lack of knowledge and experience in the area which

he was attempting to analyze, his failure to perform research, and, thus, his lack of reliability.

## IV.   Royston's Methodology Improperly Extrapolates Data and Frequently Shifts in His Three Reports.

Royston's three reports each contain new and different calculations, largely without

explanation or support, or intentionally vague bases, for the changes.  In addition, Royston took

liberties with data that went well beyond proper accounting methodologies.

### A.   Royston Flip-Flopped and Failed to Follow GAAP on HealthPort's Bad Debt Expense.

One of HealthPort's costs relating to its medical record reproduction services at Beth

Israel was ▮▮▮▮▮▮ in bad debt.  According to GAAP, bad debt is recognized as a cost of doing

business (*i.e.*, as an expense).  (Deposition of Bryan I. Hirsch ("Hirsch Dep.") at 151:6-14

(attached as Ex. I to the Litman Decl.).)  The AICPA Litigation Services and Professional

Standards say, "To the extent that generally accepted accounting principles (GAAP) are

applicable in a litigation services engagement, the practitioner shall apply the appropriate

accounting principles."  (*See* Hirsch Rpt., Ex. E, Rule 203, p. 5.)  Thus, Royston correctly

**included** bad debt in his initial April 15 Report.  (*See* Apr. 15 Rpt. at Sch. 3.)

---

[6] *See* Rebuttal Rpt. at 28 ("From Mr. Trerotola's 2016 deposition I learned that…"); *id.* ("In light of this, I have now revised my calculation. . ."; *id.* at 30 ("In his 2016 report, Mr. Trerotola provides additional information"); *id.* ("Now that additional facts have come to light, I am in a position to revise these calculations."); *id.* at 31 ("As a result of the additional information provided in Mr. Trerotola's report. . ."); *id.* at 33 ("As a result of additional information provided in Mr. Trerotola's report with respect to salaries . . ."); *id.* at 35 ("Upon reviewing Mr. Trerotola's report and deposition testimony . . .").

At his deposition twelve days later, however, Royston flip-flopped and took the position that bad debt should *not* have included in his calculation. (Apr. 2016 Dep. at 22:9-23:4.)  He expounded that his change was because, "if HealthPort accounted for its revenue on a cash basis and not an accrual basis, then as cash came in, they would report it as revenue."  (*Id*. at 23:5-20.)  But Royston acknowledged that HealthPort *does not report on a cash basis*.  (*Id.* at 23:21-24:2.)  He further admitted that, with accrual accounting, **bad debt is a cost item that must be accounted for**.  (*Id.* at 24:23-25:13 ("if they operate on an accrual basis, yes, they need to account the bad debts.").)

In removing HealthPort's ███ in bad debt from his calculation of direct costs, presumably based on his inapplicable cost accounting explanation, Royston provided neither a GAAP or other applicable explanation to support it.  (May 2 Rpt. at Sch. 3; Apr. 2016 Dep. at 22:18-25:13.)  Royston's Rebuttal Report also contains a misleading "example" explanation because it *is also based on cash accounting not accrual accounting*.  (Rebuttal Rpt. at 26-27.)  Again, even in the face of an admission that accrual accounting is the correct methodology, Royston maintains his litigation opinion excluding bad debt from the calculation.

Had Royston included bad debt as required by GAAP, his cost per page would have shown the following increases over his final calculations:

| 2011 | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|
| ■ | ■ | ■ | ■ | ■ |

(*Id*.)

## B.      Royston Created An Inflated Total Page Count, Diluting Costs Per Page.

The most basic component of the cost per page analysis is determining how many pages of medical records were processed during the class period.  To calculate the total costs incurred per page, Royston and Trerotola divided the total costs incurred by the number of pages to come

up with the costs incurred per page calculation.  At a basic level, the higher the pages, the lower

the cost per page.  Therefore, it is in Plaintiff's interest for there to be a higher number of pages,

and in HealthPort's interest for there to be a lower number of pages.  (Apr. 2016 Dep. at 85:25-

86:16.)

      HealthPort provided three separate total page counts processed during the class period.

These calculations came from a different databases each of which had its own purpose and

person entering the data, which accounts for the differences.   Only two of the page counts are at

issue: ████████████████████████ and ██████████████████████████████

██.  (*See* May 2 Rpt. at 3 and Exs. E and F thereto; Trerotola Rpt. at 4.)  Royston did not ask

Plaintiff's counsel to find out which of the two figures - ████████████████ – was the

correct number.  (Apr. 2016 Dep. at 64:9-65:2, 69:13-72:10.)  He did, however, ask Plaintiff's

counsel to inquire into whether the third page count -- a ██████ page figure or the ████████

figure -- was correct.  (*Id.* at 70:8-72:10.)  He was informed by HealthPort's counsel that the

page count totaling ████████ was correct.  (*Id.*)

      Royston was free to accept HealthPort's statement that the ████████ page count was

correct, or to reject it and use the ████████ pages figure from another database.  He did neither.

Instead, for each year in the class period, Royston simply picked the higher of the two figures

from each database, cherry-picking the most favorable (*i.e.*, highest) figure for Plaintiff.  (*See*

May 2 Rpt. at 3-4, Sch. 2.)  As a result, he created his own page count of ████████, which

significantly exceeds the total pages reflected in any database.

      Royston acknowledged that the ████████ page count he created does not appear in any

report provided by HealthPort.  (Apr. 2016 Dep. at 78:9-80:7.)  He also admitted that he has no

knowledge of HealthPort's different databases, or have any understanding as to why there might

be variations in the figures each produces.  (*Id.* at 82:9-84:25.)  Nor did he attempt to find out.

He simply decided that because the percentage difference for most years was between the █

█████████ figures was small, he would combine the numbers to create his own page count.

(*Id*. at 80:8-81:17, 85:1-24.)  He testified that his decision to create his own page count was not

based on any standard methodology.  (*Id*. )  Moreover, despite his lack of knowledge or

experience in either industry at issue, he testified that his combining page counts was based on

his "professional opinion."  (*Id.* at 80:13-23.)  All three of Royston's reports use this artificially

inflated page total.

### C.    Royston Significantly Underaccounted For Employee Salaries, But Changed them Based on Trerotola's Report.

Beth Israel employed nine full time employees to perform ROI services (seven at Beth

Israel and two at Phillips Ambulatory ("Phillips")).  (Deposition of Yazmin Navarro ("Navarro

Dep.") at 48:3-5, 196:6-10, 260:16-23 (excerpts attached as Ex. J to the Litman Decl.); Trerotola

Rpt. Ex. D ("Navarro Decl.") ¶¶ 3-4.)  Beth Israel provided the salary information for those

employees for the class period.  (*See* Trerotola Rpt. at 8-9.)  In addition, Yazmin Navarro, the

manager of Beth Israel's Correspondence Unit in the Medical Records Department, stated in her

deposition that there were seven employees that worked exclusively in ROI in the

Correspondence Unit and other employees that worked in the Ambulatory Clinic.  (Navarro Dep.

at 48:3-5, 196:6-10, 260:16-23.)

Although Royston had Ms. Navarro's testimony when preparing his reports, his April 15

and May 2 Reports omitted the salaries of several employees during the class period.  (Apr. 15

Rpt. at 9-11, Sch. 6; May 2 Rpt. at 9-12, Sch. 6.)  In 2011, he only included 6 employees; in

2012 and 2013, he included 7 employees; in 2014, he included 8 employees; and in 2015, he

included 9 employees.  (May 2 Rpt. at Sch. 5 and 6.)  His reasoning was based on an over

reliance on job titles from Navarro's deposition with no further investigation.  (Apr. 2016 Dep. at 119:2-122:5.)  He also included no costs associated with any supervising Beth Israel employee above Ms. Navarro.

Lastly, in his April 15 and May 2 Reports, Royston discounted Ms. Navarro's salary by 50%.  (Apr. 15 Rpt. at 10, Sch. 5; May 2 Rpt. at 10, Sch. 5; Apr. 2016 Dep. at 119:8-22.)  This percentage, Royston testified, was a "guess."  (Apr. 2016 Dep. at 119:20-22, 122:1-5.)  He made no effort to investigate how much of Ms. Navarro's time he should allocate to Beth Israel's direct costs, admitting it could be 5% or it could be 95%.  (*Id.* at 122:1-122:20.)  This unabated conjecture was based on a stray comment in her deposition that not all of her time was dedicated to ROI activities (May 2 Rpt. at 10 (quoting Navarro Dep. at 18:6-20).), and that she also oversees the unit and "process[es] appeals and audits for health insurance, health vendors - - health insurance vendors."  (Apr. 2016 Dep. at 119:23-122:20.)  Royston made no effort to clarify this important point, and certainly has no experience or industry knowledge upon which to render an estimate.

Trerotola, on the other hand, spent two full days on site at Beth Israel observing operations and interviewing HealthPort and Beth Israel employees.  (Deposition of Gregory Trerotola ("Trerotola Dep.") at 15:7-18:10 (excerpts attached as Ex. K to the Litman Decl.); Trerotola Rpt. at 2.)  Ms. Navarro executed a Declaration confirming that nine people were employed by Beth Israel and/or Phillips during the class period to perform ROI services.  (Navarro Decl. ¶¶ 3-4.)  She also confirmed that 100% of her time was spent on ROI services.  (*Id.* ¶ 3.)  Ms. Navarro also testified and confirmed in her Declaration that her managers spent a portion of their time on ROI related services.  (Navarro Decl. ¶ 8; Navarro Dep. at 267:22-

268:12.) Based on this and his interviews, Trerotola also allocated 14% and 5% of the salaries of Ms. Navarro's managers to Beth Israel's direct costs. (Trerotola Rpt. at 10.)

After receiving Trerotola's report and realizing his vast mistakes, Royston modified his cost per page calculation. He suddenly accepted 100% of Ms. Navarro's salary as part of Beth Israel's direct costs. (Rebuttal Rpt. at 30-31, Sch. 2, 3.) Royston also added the full amount of the other eight employees' salaries, with the exception of 2011 and 2015 when he arbitrarily omitted some salaries with no explanation. (*Id.* at 30-31, Sch. 3.) The difference between the labor costs that Royston allocated in the first two reports and the third report totaled ▮▮▮▮:

| Year | Apr. 15 & May 2 Reports | Rebuttal Report | Total Difference |
|---|---|---|---|
| 2011 | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| 2012 | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| 2013 | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| 2014 | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| 2015 | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| | | **Total:** | ▮▮▮ |

(Rebuttal Rpt. at 30-31.)

Royston still declined to include any percentage of Ms. Navarro's managers' salaries -- attempting to capitalize on his lack of research by stating that there was "no information" as to what percentage of their time was dedicated to ROI services. As a result, despite his revision, there remains an overall ▮▮▮ per page difference between Royston and Trerotola. (Rebuttal Rpt. at 32.)

### D. Royston Double Counted Expenses to Drive Down HealthPort's Indirect Costs, and Changed His Calculation When He was Caught.

HealthPort's documents showed its national direct labor costs such as salaries and its

11

national indirect overhead costs.  (Apr. 15 Rpt. at 6-8.)  However, HealthPort's indirect expenses attributable to its ROI services for Beth Israel could only be calculated through the use of accounting ratios.  Royston and Trerotola agreed that the best way to perform this calculation was to use a ratio of HealthPort's direct labor costs nationally to indirect expenses nationally. (*Id.*; May 2 Rpt. at 6-8; Trerotola Rpt. at 5.)  This should be a simple calculation – take HealthPort's direct labor costs nationally and divide that by HealthPort's national indirect expenses.  Then, apply that same percentage locally (*i.e.*, to the known labor costs at Beth Israel), to determine HealthPort's indirect costs associated with Beth Israel.

In his April 15 Report, instead of making the simple calculation, Royston used the improper formula of direct labor expenses divided by indirect expense *plus* direct labor expenses. This artificially drove up the denominator and reduced the attributable percentage.  (Apr. 15 Rpt. at Sch. 4; Apr. 2016 Dep. at 109:3-113:8.)  For example, for 2012, he combined ███████ (indirect expenses) with ████████ (direct expenses) for a total of ████████.  This resulted in the percentage of indirect expenses to labor being ████████████████████. (*See* Apr. 15 Rpt., Sch. 4.)  At his deposition, Royston could not identify any authoritative text or accepted accounting principles supporting this double counting in the denominator.  (Apr. 2016 Dep. at 114:18-115:9.)

After his deposition, Royston realized that he was caught artificially inflating the denominator and changed his calculation.  In his May 2 Report, without a specific explanation as to why, Royston removed his double counting of the indirect expenses; he recalculated the indirect expenses as a direct percentage of the labor costs, without adding the indirect labor expenses back in to the denominator.  (May 2 Rpt. at 7-8, Sch. 4.)  This resulted in a significant increase in the percentage of labor costs for each year of █████ in 2011 and 2012, █████ in

2013, and ███ in 2014 and 2015.  (*Compare* Apr. 15 Rpt. at Sch. 4, with May 2 Rpt. at Sch. 4.)  As a result, when Royston applied the higher percentage, the total indirect expense for HealthPort was increased by ███, leading to an increase of ███ per page each year. (Apr. 15 Rpt. at 8, Sch. 4; May 2 Rpt. at 8, Sch. 4.)

> **E.    Royston Excluded Beth Israel's Indirect Costs Without Support, Then Attempted to Add Them Back Without Using Beth Israel's Actual Indirect Cost Data.**

Beth Israel produced its Medicare Cost Report showing its indirect costs attributable to its medical records unit.[7]  Yet, in both the April 15 and May 2 Reports, Royston excluded all indirect costs associated with Beth Israel's role in responding to medical records requests -- all space, electricity, IT, HR and other indirect costs associated with it.  (Apr. 15 Rpt. at 12-13; May 2 Rpt. at 12-13; Apr. 2016 Dep. at 89:23-90:8.)  Royston's initial explanation was that these costs were "effectively fixed costs," and he believed that the Court's Order did not instruct the inclusion of these costs as "costs incurred."  (May 2 Rpt. at 13; Apr. 2016 Dep. at 90:9-21.)  His exclusion of indirect costs was "not based on what an authoritative text might or might not say," nor did he rely on any generally accepted accounting principles for this exclusion.[8]  (Apr. 2016 Dep. at 90:9-91:1.)  This exclusion removed over ███ in costs from Royston's cost incurred calculation.

Both Trerotola and HealthPort expert witness Bryan Hirsch pointed out that the Court specifically included appropriate indirect costs in its definition of "costs incurred."  (Trerotola Rpt. at 13-14; Hirsch Rpt. at 5-6.) The November 9, 2015 Order, the Court stated that costs incurred included "*all* demonstrable and reasonable costs incurred in providing its services to a

---

[7] The correspondence unit, which is the unit that operates Beth Israel's medical record reproduction operation and includes both Beth Israel and HealthPort employees, is a subset of Beth Israel's medical records department.

[8] Royston acknowledged that when he typically calculates all costs, it is his standard practice to include all costs (*i.e.*, both direct and indirect).  (Apr. 2016 Dep. at 94:24-95:13.)

requester.  These include *indirect* as well as direct costs." (Dkt. 151 at 10-11 (emphasis added).) Applying this definition, Trerotola used a Medicare Cost Report produced by Beth Israel that showed Beth Israel's Medical Record Unit's indirect costs to calculate those attributable to the correspondence unit (which is part of the Medical Record Unit). (Trerotola Rpt. at 13-14.)

Upon receipt of Defendants' experts' reports, and despite his initial opinion, Royston reversed course.  But in so doing he did not use Beth Israel's Medicare Cost Report, admitting that he lacked the requisite knowledge and expertise to understand and evaluate its components. (Rebuttal Rpt. at 8.)  Indeed, Royston conceded that he "was not engaged to understand the unique regulatory and financial reporting requirements of the hospital and medical records industry." (*Id.*)  While admitting he lacked knowledge and competence to understand it, Royston nonetheless asserted that Beth Israel's Medicare Cost Report was insufficient to "enable the calculation of 'demonstrable and reasonable costs fairly attributable to responding to patient requests for medical records,'" as the Court required.[9] (*Id.* at 40 (citation omitted).)

As an alternative, and without any support, Royston suggested that Beth Israel's indirect costs could be calculated by using *HealthPort's* indirect costs as a proxy. (Rebuttal Rpt. at 41.) For each class year, Royston applied a ratio from *HealthPort's* indirect costs to direct costs to calculate *Beth Israel's* indirect costs from its direct costs. (*Id.*)  For example, in 2011, Royston determined that HealthPort's indirect costs were ▬▬▬ of its direct costs. (*Id.*)  That year, Beth Israel's direct costs were ▬▬▬▬▬. (*Id.*)  Applying the HealthPort percentage to Beth Israel's direct costs, Royston calculated the 2011 indirect costs for Beth Israel to be ▬▬▬▬ ▬▬. (*Id.*)  By using a ratio calculated from HealthPort's data instead of using Beth Israel's

---

[9] His position on Beth Israel's cost report is irreconcilable. If Royston does not have the expertise to understand the cost report, he is not in a position to reject its use in estimating costs as "insufficient."

actual data, Royston's per page costs attributable to Beth Israel averaged ███████ lower over the class period than those calculated by Trerotola, who used actual data.  (*Id.* at 42.)

Royston did not identify any accounting principles or authoritative text authorizing using a proxy ratio instead of actual data.  Nor did Royston consider the vast differences between HealthPort and Beth Israel's operations, financial or otherwise.  HealthPort is a modern business based in Georgia that contracts with medical facilities to provide ROI services.  Beth Israel is a century-old teaching hospital in the center of Manhattan that is subject to vast regulatory authority and other legal constraints.  It is in the business of providing patient care services, not copying medical records.  Royston's proxy uses data from an apple and applies it to a hamburger.  Moreover, he had the hamburger's data available to him to use and ignored it.  This is an improper use of a proxy, and the results are not reliable and will not assist the jury.

## LAW & ARGUMENT

Pursuant to Rule 702, "a witness will be qualified to testify as an expert only if the proposed expert has 'specialized knowledge' through 'experience, training or education' to render his or her opinion."  *Dollman v. Mast Indus*., 08 Civ. 10184 (WHP), 2011 U.S. Dist. LEXIS 99802, at *9 (S.D.N.Y. Sept. 6, 2011) (quoting *Daubert v. Merrell Dew Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  A *qualified* expert witness may testify to a an opinion only if "(a) the expert's . . . knowledge will help the trier of fact to <u>understand</u> the <u>evidence</u> or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702 (emphasis added).

To determine whether a proposed expert's testimony is admissible under Rule 702, courts must make inquiries into: "(1) the qualifications of the proposed expert, (2) whether each proposed opinion is based on reliable data and reliable methodology; and (3) whether the

15

proposed testimony would be helpful to the trier of fact." *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citing *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)). The party offering expert testimony bears the burden of establishing, by a preponderance of the evidence, that the expert is qualified and his opinions are reliable. *SEC v. Mudd*, No. 11-cv-9202 (PAC), 2016 U.S. Dist. LEXIS 59273, at *4 (S.D.N.Y. May 4, 2016); *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096 (DLC), 2015 U.S. Dist. LEXIS 108320, at *19-20 (S.D.N.Y. Aug. 17, 2015).

Royston's testimony does not pass the standard set forth under Rule 702. First, Royston is not qualified to render an opinion on the costs incurred for responding to medical records requests as he admittedly lacks any experience in either the ROI or hospital industries. Second, simply comparing the three reports submitted by Royston since the certification of the class demonstrates that his methodology is unreliable as his numbers change in each report despite the fact that the data has stayed the same. Finally, because Royston does not himself understand the ROI or hospital industry finance, his analysis and therefore testimony on the costs incurred by these industries in responding to medical records requests will only confuse the trier of fact.

I.      **Royston Is Unqualified As An Expert In The Relevant Fields Of Knowledge.**

Royston lacks the necessary knowledge and experience to qualify him to offer his opinions. As a CPA, Royston has general accounting experience. But the determination of the costs incurred in responding to medical records requests requires more than general accounting experience and ability to maneuver numbers on a spreadsheet; such a determination requires specific knowledge of hospital finance, the ROI industry, and their applicable regulations.

Expert testimony must be field-specific. *Dolman,* 2011 U.S. Dist. LEXIS 99802, at *9; *Adesina v. Aladan Corp.,* 438 F. Supp. 2d 329, 341 (S.D.N.Y. 2006) ("To be qualified, the expert must be 'well-versed in the particular discipline relevant to their testimony.'" (citation omitted)).

Thus, if a proffered witness lacks sufficient expertise in the particular field, his testimony should be excluded. *See Stagl v. Delta Air Lines*, 117 F.3d 76, 81 (2d Cir. 1997); *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 431-32 (W.D.N.Y. 2005). Indeed, "if *Daubert*'s requirement that an expert must be sufficiently qualified and have a certain level of expertise is to mean anything, it must mean that such qualifications and expertise are real – ***simply being an expert at being an expert is not enough***." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 U.S. Dist. LEXIS 155136, at *49 (S.D.N.Y. Oct. 29, 2013) (emphasis added).

Courts routinely exclude experts where their expertise does not fit the case. In *Trumps v. Toastmaster, Inc.*, which involved an electrical malfunction, the plaintiff offered a mechanical engineering expert with no electrical engineering experience. 969 F. Supp. 247, 249 (S.D.N.Y. 1997). The court excluded the plaintiff's expert because even though he was a qualified mechanical engineer, he was "out of his field" because he lacked the necessary electrical engineering experience. *Id.* at 252.

In *Louissier v. Universal Music Group, Inc.*, the plaintiff sought to designate an "apportionment" expert to determine the portion of defendant's sales that were attributable to the inclusion of an allegedly infringing song in a copyright infringement suit. No. 02 Civ. 2447 (KMW), 2005 U.S. Dist. LEXIS 45430, at *1-2 (S.D.N.Y. June 28, 2005). The proffered expert had extensive litigation consulting experience, including in reviewing recording contracts to ensure accurate payment of royalties, but no experience specifically in marketing and sales of a product in the music industry. *Id.* at *9-10. The court determined that the witness's generalized knowledge, coupled with her Google searches, was insufficient and, thus, excluded her testimony. *Id.* at *10, *12.

17

Royston is similarly "out of his field" in the hospital and medical record reproduction industries, which are "specialized industries which require specialized knowledge to understand their unique regulatory and financial reporting requirements."  (Hirsch Rpt. at 3.)  Royston admittedly does not have the specialized background or knowledge necessary to understand the unique medical reproduction processing industry.  He has:

- no experience auditing or performing valuations of hospitals or ROI companies;

- no knowledge of the accounting procedures and regulations required of Medicare, Medicaid or the department of health and human services; and

- no knowledge of and has never observed the operations of any ROI department.

(*See* 2015 Dep. at 44:13-24; Apr. 2016 Dep. at 47-50, 50:8-12.)

Royston had sources available to him through which he could acquire knowledge relating to the medical reproduction industry,[10] but he failed to conduct any independent research on how ROI contractors like HealthPort operate, choosing to instead rely on Google searches.  (Apr. 2016 Dep. at 37:11-15 (noting that 90% of his research consisted of Google searching and 10% consisted of searching through library portals).)[11]

Royston's reports reflect his lack of relevant knowledge.  In fact, he admits that many of his conclusions in his reports are not supported by GAAP or any other authoritative text.  (Apr. 2016 Dep. at 54:24-55:3, 80:13-23, 90:2-91:1, 114:18-115:6.)  Royston did not research or rely on generally accepted accounting standards or other authoritative texts relating to calculating medical records reproduction costs.  (*See id.* at 90:2-91:1, 114:18-115:6.)  Further, his lack of experience, knowledge, and inability to understand the Medicare Cost Report clearly hampered

---

[10] Hirsch Rpt. at 3.

[11] Though Royston claims in his Supplemental Report that he referenced IbisWorld, a reliable source for accounting information, Royston testified that his April 2016 report listed all of the materials he reviewed. (*See* Apr. 2016 Dep. at 52:9-14, 54:15-55:3; 2015 Dep. 24:11-19, 91:6-10.) It did not reference IbisWorld.

his opinions.  His remedy for that was to improperly reject actual data and substitute ratios, that themselves were improper, to reach an unreliable conclusion.  *Supra* at 13-15.

Royston's lack of experience is further highlighted by his reliance on HealthPort's expert Greg Trerotola.  (Trerotola Rpt. at 1.)  Royston's April 15 Report was prepared before Trerotola disclosed his cost-per-page calculation for Beth Israel and, as described *supra* at 6-15, had significant errors.  Royston's Rebuttal Report shows that his significantly altered opinions were not the result of his own knowledge or expertise, new facts or data not previously available to him, or independent investigation and analysis.  He simply relied on Trerotola's research and analysis.  (Rebuttal Rpt. at 27-45.)

For these reasons, Royston is not qualified to render an opinion on HealthPort's costs incurred in responding to medical records requests to Beth Israel.

## II.    Royston's Opinions Are Unreliable.

Expert testimony is admissible only if the Court finds that it is both relevant and reliable. *Marini v. Adamo*, 995 F. Supp. 2d 155, 179 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016); *see also*, Fed. R. Evid. 702; *Nimely,* 414 F.3d at 396; *IBEW Local 90 Pension Fund*, 2013 U.S. Dist. LEXIS 155136, at *50-54.  If an expert opinion based on a methodology is "simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Oleg Cassini, Inc. v. Electrolux Home Prods.*, No. 11-cv-1237 (LGS) (JCF), 2014 U.S. Dist. LEXIS 52085, at *16 (S.D.N.Y. Apr. 15, 2014) (internal quotations and citation omitted).

The Court should exclude Royston's testimony as unreliable because:

- He excluded HealthPort's bad debt in violation of generally accepted accounting principles;

- He miscalculated HealthPort's indirect costs, changing course once his improper calculation was brought to light;

- He excluded ▮▮▮▮▮▮ in Beth Israel's indirect costs without explanation and, when he changed course and suggested that they may be relevant, used a tortured proxy methodology instead of using actual data that was available to him all along;

- He created an artificially high page count from two databases despite lacking any personal knowledge or reasonable basis on which to do so; and

- He read Yazmin Navarro's testimony in an overly limited fashion and initially excluded a significant portion of her and other ROI employees' labor costs from his calculation, modifying his opinion only once HealthPort's expert Trerotola pointed out his severe under accounting.

Royston's constantly shifting approach evidences that his calculations are not based on any accepted methodology, but are instead purely results oriented. Indeed, it is not even clear which calculation Royston ultimately intends to use at the trial of this case.

### A.    Royston Did Not Apply Proper Accounting Principles To Exclude HealthPort's Bad Debt.

Royston's most flagrant accounting error was his exclusion of bad debt from his calculation of the per-page costs incurred. As a CPA and member of the AICPA, Royston was required to follow professional standards set forth in guidelines issued by his licensing organization, the AICPA. The AICPA Professional standards say, "To the extent that generally accepted accounting principles (GAAP) are applicable in a litigation services engagement, the practitioner shall apply the appropriate accounting principles. (*See* Hirsch Rpt., Ex. E, Rule 203, p. 5.) GAAP recognize bad debt as an expense. *Supra* at 6-7.

Consistent with the AICPA and GAAP, Royston initially included HealthPort's bad debt in his calculation of HealthPort's direct costs. (Apr. 15 Rpt. at Sch. 3.) He then did an about face and, during his deposition took the position that bad debt should be excluded. *Supra* at 6-7. His May 2 Corrected Report, therefore, excluded ▮▮▮▮▮▮ in bad debt. (May 2 Rpt. at Sch. 3.)

Royston's exclusion of bad debt is not supported by any guidelines or standard accounting principles. *Supra* at 6-7. Rather, he excluded the bad debt on the theory that, in cash

basis accounting, bad debt would not be an expense, but would be a component of (lost) profit. *Supra* at 6-7. Critically, however, Royston, admitted that ***HealthPort does not report on a cash basis*** and that, with accrual accounting bad debt is an expense. *Supra* at 6-7. Royston's exclusion of bad debt is, therefore, inconsistent with HealthPort's method of accounting and GAAP, rendering it unreliable and inadmissible. *Mudd*, 2016 U.S. Dist. LEXIS 59273, at *26 (expert testimony unreliable where the witness uses a nonstandard methodology and cannot cite any authority supporting a departure from the standard).

**B.      Royston Miscalculated HealthPort's Indirect costs.**

Royston initially added the indirect expenses into the direct expenses and then divided the indirect expenses by the combined number, double counting the indirect expenses and artificially depressing the ratio. *Supra* at 11-13. Once his improper calculation was brought to light at his deposition, Royston changed the calculation in his May 2 Report, calculating the indirect expenses as a direct percentage of the labor costs. This resulted in a significantly increased ratio, and ultimately an increase of ███████████. Royston did not provide any explanation for his change; Plaintiff's counsel simply claimed that the May 2 report clarified Royston's method of calculating indirect expenses. *Supra* at 11-13. Because Royston failed to follow the standard methodology and has been unable to identify any accepted authority supporting his deviations from the standard, his opinions and testimony are unreliable and must be excluded. *Mudd*, 2016 U.S. Dist. LEXIS 59273, at *26.

**C.      Royston Improperly Excluded Beth Israel's Indirect Costs, Despite This Court's Order That Indirect Costs Are Part Of The "Costs Incurred" Calculation.**

Royston failed to support his exclusion of Beth Israel's direct costs and, even once he acknowledged that they "may be" part of the costs incurred calculation, used an unsound "proxy" methodology to calculate them instead of using the available, actual data.

21

Despite acknowledging that it is his typical practice when calculating total costs to add up all costs, both direct and indirect, Apr. 2016 Dep. at 94:24-95:13, Royston chose not to include *any* indirect costs associated with Beth Israel's role in responding to medical records requests in his first two reports. *Supra* at 13-15. In doing so, Royston ignored the Court's definition of costs incurred and violated AICPA rules. (Hirsch Rpt. at 5.) Thus, Royston did not follow any accepted standard, his typical practice, or the Court's Order in either his April 15 or May 2 Reports. The result is that Royston wrongly excluded over ██████████ in indirect costs. The only explanation for his exclusion of these costs is that they would have significantly increased the average cost incurred per page, which conflicts with Plaintiff's litigation position. *Supra* at 13-15.

After Trerotola and Hirsh issued their reports and criticized Royston for misconstruing the Court's Order, Royston changed course and included indirect costs in his calculation. This time, he claimed that he excluded them because he could not calculate these costs with the information that Beth Israel provided. *Supra* at 14. This is false. He had the information necessary for the calculation -- Beth Israel produced its indirect costs in its Medicare Cost Report, ██████. (Trerotola Rpt. Ex. O.) Royston admitted that he did not understand the report. *Supra* at 14. Therefore, his rejection of the report was not based on any accounting principle or reasoned approach; he simply lacked the knowledge or expertise in dealing with such reports to utilize the site-specific information contained therein.

Royston's decision to attempt to estimate Beth Israel's indirect costs using HealthPort's indirect cost percentage as a proxy is totally unreliable, and he offers no authoritative basis for doing so. *Supra* at 14-15. A proxy may make sense where a party is dealing with comparable data, industries, or businesses. Here, however, the businesses are entirely different. *Supra* at 14-

15.  It makes no logical sense for HealthPort, an ROI service provider, to be an accurate proxy for Beth Israel, a century old provider of medical care services because their overhead is significantly different.  Rather, his calculations are more likely driven by a desire to avoid including ███████ in costs, which would have obliterated Plaintiff's litigation position and the ultimate goal of keeping the cost per page calculation below $.75 per page.

>    **D.  Royston Relied On A Knowingly Wrong Calculation Of The Total Number Of Pages Processed During The Class Period.**

Royston arbitrarily picked the number of pages processed each year during the class period and landed on a number that he knows is not reflective of any total page number in HealthPort's databases.  Royston combined two different databases and cherry picked the highest number of pages from each year and used that for his total number of pages calculation.  The number he settled on was ███████, a number that *he knows is wrong* because it is larger than the total pages reported in either database.  *Supra* at 7-9.

He did not base this calculation on any knowledge he has of the two databases or the ROI industry because he has no such knowledge.  *Supra* at 7-9.  Nor did he apply any generally accepted accounting principles supporting this method, saying instead that it was based on "simply my professional opinion."  (Apr. 2016 Dep. at 75:17-80:23.)  Royston's calculation of the total number of pages, therefore, lacks any foundation in the facts, rendering it unreliable.

Royston's methodology would have had a factual basis even if he had used the ██ ███ pages figure from the databases.  (Trerotola Dep. at 135:4-136:4.)  However, without knowing the reason for the discrepancy between the databases, and without any basis other than a desire to increase the number of pages to be used in the cost per page calculation, it was entirely inappropriate for Royston to pick and choose numbers from both databases, creating a hybrid number that exceeds the total pages in either database.  (*Id.* ("[I]f you're going to pick

23

total number of pages for a given period of time, you should be consistent in those assumptions. You either take from one database or the other database. You don't mix and match the databases.").)

      **E.**    **Royston Failed To Properly Account For Employee Salaries.**

      Royston does not dispute the testimony from Ms. Navarro that Beth Israel (including Phillips Ambulatory Care Center) employed nine full-time employees to perform ROI services during the entire class period. *Supra* at 9-10. Nonetheless, in his April 15 and May 2 Reports, Royston only considered between five and eight full-time employees, severely under accounting for Beth Israel's direct labor costs. (Apr. 15 Rpt. at 9-10, Sch. 6; May 2 Rpt. at Sch. 6.)[12]

      In his Rebuttal Report, Royston reversed course and included eight full-time employees, falsely asserting that it was the result of "additional information." (Rebuttal Rpt. at 30-31.) Royston had all of the documents and information necessary to make this calculation when he offered his first two reports. Royston simply relied on Trerotola's report and then modified his own. Thus, the calculations in his April 15 and May 2 Reports were yet another instance where Royston ignored the facts and data and failed to undertake an investigation, choosing instead to pick figures that would be more beneficial to Plaintiff.

      Even the Rebuttal Report continues to wrongly exclude certain employees' salaries without any basis. For example, Royston failed to allocate salaries for all nine employees for the entire class period, despite Ms. Navarro's statements – which he has never challenged – to the contrary. He also failed to attribute any costs to the department managers supervising the

---

[12] For one of the employees, Yazmin Navarro, Royston admits that he initially guessed and set her pay at 50% without any basis for doing so. (Apr. 2016 Dep. at 119-120.) The only research he engaged in to determine what amount of Ms. Navarro's work was dedicated to responding to records requests was a Google search, which did not give him any additional information. (*Id.* at 121.) Unlike Royston, HealthPort's expert Greg Trerotola, asked Ms. Navarro about the level of work she dedicated to ROI services and she confirmed that 100% of her time is dedicated to ROI. *Supra* at 10-11. Thus, in his Rebuttal Report, Royston accepted Trerotola's work and included 100% of Ms. Navarro's salary in his calculation. (Rebuttal Rpt. at 30.)

correspondence unit and ROI activities.  (Rebuttal Rpt. at 31.)  Although he relied on Ms. Navarro's declaration to support the changes to his overall calculations, Royston did not accept her statement that her managers spend some portion of their time engaging in ROI-related activities.  (*Id.*; Navarro Decl. ¶ 8.)  It is not simply that Royston disagreed with the proportion of the managers' salaries that should be allocated to Beth Israel's direct costs; he outright rejected *any* portion of their activities being attributed to ROI services, despite Ms. Navarro's statements and with no contrary information.

Royston changed his calculations throughout his reports and failed to properly take into account even a portion of managerial expenses attributable to ROI services, rendering his opinions unreliable.  Thus, Royston significantly undervalues Beth Israel's labor-related direct costs without a valid factual basis.

## CONCLUSION

Royston's lack of relevant experience or knowledge is fatal.  However, going beyond that, Royston's constantly changing calculations and methodologies have removed any semblance of reliability from his calculations.  Therefore, his opinions and testimony should be excluded in their entirety.

Dated:  September 2, 2016
      New York, New York

              Respectfully submitted,

              THOMPSON HINE LLP

              By: /s/  Seth A. Litman
                    Seth A. Litman (admitted *pro hac vice*)
                    (seth.litman@thompsonhine.com)
                    Rebecca Brazzano
                    (rebecca.brazzano@thompsonhine.com)

              335 Madison Avenue
              New York, New York  10017

(212) 344-5680

-and-

LYNCH DASKAL EMERY LLP
James R. Lynch
Scott R. Emery
137 West 25th Street, Fifth Floor
New York, New York  10001
(212) 302-2400

*Attorneys for HealthPort Technologies, LLC*

825016

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 15, 2016, a true and correct copy of the foregoing Redacted

Public Version was filed electronically and served by mail on anyone unable to accept electronic

filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's

electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the

Notice of Electronic Filing.  Parties may access this filing through the Court's CM/EMF system.

*/s/Seth A. Litman*
_____
Seth A. Litman
